No. 22-_______________

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,

*Plaintiffs-Respondents*,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, and DOES 1-10, inclusive,

*Defendant-Petitioner.*

---

Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:20-cv-00893-FMO-KS
The Honorable Fernando M. Olguin

---

# LABCORP'S RULE 23(f) PETITION FOR PERMISSION TO APPEAL ORDER GRANTING CLASS CERTIFICATION

---

Robert I. Steiner
rsteiner@kelleydrye.com
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
212-808-7800

Becca J. Wahlquist
bwahlquist@kelleydrye.com
KELLEY DRYE & WARREN LLP
350 South Grand Avenue, Suite 3800
Los Angeles, California 90071
213-547-4900

Attorneys for Petitioner
LABORATORY CORPORATION OF AMERICA HOLDINGS

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Defendant and Petitioner LABORATORY CORPORATION OF AMERICA HOLDINGS d/b/a Labcorp, a nongovernmental, publicly traded, corporate party, certifies that no publicly held corporate parent owns more than 10% of its stock.

Date: June 6, 2022

Respectfully submitted,

*/s/ Robert I. Steiner*
Robert I. Steiner
Becca Wahlquist

*Counsel for Petitioner*
*Laboratory Corporation of America Holdings*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................................... i
RELIEF REQUESTED ...............................................................................1
INTRODUCTION AND SUMMARY ..........................................................1
FACTS PERTINENT TO THE PETITION ..................................................4

**A.** Labcorp's Patient Service Centers (PSCs)................................4

**B.** Plaintiffs' Visits To Labcorp Patient Service Centers ..............6

**C.** The Certified Classes ..........................................................8

QUESTIONS PRESENTED.........................................................................9
STANDARD OF REVIEW ..........................................................................9
REASONS FOR GRANTING THE PETITION...........................................10

**I.** The Court's Certification Of The Unruh Act California Class Has Caused Significant Confusion In This Circuit. ..........................10

**II.** The District Court Manifestly Erred In Certifying Fail-Safe Classes. ..........................................................................................13

**III.** The District Court Manifestly Erred In Certifying The Rule 23(b)(3) Unruh Act Damages Subclass............................................14

**A.** The District Court manifestly erred in failing to consider evidence that many Rule 23(b)(3) damages class members would lack standing to proceed. ..............................14

**B.** The District Court manifestly erred in finding predominance, typicality manageability, and superiority for the California subclass. ...................................................17

**IV.** The District Court Manifestly Erred In Certifying The Nationwide Class.........................................................................19

CONCLUSION ........................................................................................20
CERTIFICATE OF COMPLIANCE............................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
No. 6-cv-2671 BTM, 2012 WL 3762440 (S.D. Cal. Aug. 28, 2012).....10, 11, 12

*Botosan v. Paul McNally Realty*,
216 F.3d 827 (9th Cir. 2000) ....................................................................10

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) ......................................................................9

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
631 F.3d 939 (9th Cir. 2011) ....................................................................15

*Gomez v. Como*,
2022 WL 1082016 (C.D. Cal. Apr. 11, 2022) ..............................................15

*Hawkins v. Comparet-Cassani*,
251 F.3d 1230 (9th Cir. 2001) ..................................................................10

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134 (9th Cir. 2022) ...................................................................18

*Melgar v. CSK Auto, Inc.*,
681 F. App'x 605 (9th Cir. 2017) ..............................................................13

*Moeller v. Taco Bell Corp.*,
No. C 2–5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012)........10, 11, 12

*Nevarez v. Forty Niners Football Co., LLC*,
326 F.R.D. 562 (N.D. Cal. 2018)..........................................................12, 13, 18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ...........................................................*passim*

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................................................................................16

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)....................................................................3, 14, 15, 16

*Vargas v. Quest Diagnostics Clinical Labs.*,
No. 19-cv-8108-DMG, 2021 WL 5989958 (C.D. Cal. Dec. 2,
2021) (App. Ex. B) ......................................................................................*passim*

*Vondersaar v. Starbucks Corp.*,
No. CV 12-05027 DDP, 2015 WL 629437 (C.D. Cal. 2015) ................10, 11, 12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..........................................................................................19

**Statutes**

The Americans with Disabilities Act, 42 U.S.C. §§ 12102, et seq..................*passim*

California Unruh Civil Rights Act, Cal. Civ. Code § 51 .................................*passim*

**Other Authorities**

Fed. R. App. P. 5(a) ..............................................................................................1

Fed. R. Civ. P. 23 ..........................................................................................*passim*

## RELIEF REQUESTED

Defendant-Petitioner Laboratory Corporation of America Holdings ("Labcorp") seeks permission under Fed. R. Civ. P. 23(f) and Fed. R. App. P. 5(a) to appeal an Order Granting Motion for Class Certification entered by the District Court for the Central District of California, Hon. Fernando M. Olguin, on May 23, 2022. *See* Certification Order, attached at Appendix ("App.") Ex. A.

## INTRODUCTION AND SUMMARY

First, granting this petition will allow this Court to address a clear intra-circuit inconsistency on whether common issues predominate in a Rule 23(b)(3) damages class. In another class action case involving the same plaintiff (Vargas), the same California Unruh Act damages claim, the same case theory, the use of similar check-in kiosks by Labcorp's competitor (Quest Diagnostics), and even the same class counsel making the same legal arguments, another court in the very same district came "to the ineluctable conclusion that individualized issues will predominate over common ones with respect to the California sub-class" and ***denied*** Vargas's request to certify a California sub-class premised on his Unruh Act claim. *Vargas v. Quest Diagnostics Clinical Labs.*, No. 19-cv-8108-DMG (MRWx), 2021 WL 5989958, at *9 (C.D. Cal. Dec. 2, 2021) ("*Quest*") (App. Ex. B).

Yet months later, the District Court judge in this case against Labcorp certified Vargas's same Unruh Act damages sub-class. Unless this Court resolves the

conflict, these inconsistent legal assessments will cause confusion that will spread to other Unruh Act class action cases and beyond.

Second, granting this petition will allow this Court to address the impropriety of certifying fail-safe classes. Here, Plaintiffs complain that optional check-in kiosks at Labcorp's patient service centers ("PSCs") are not accessible to legally blind individuals, and argue that Title III of the Americans with Disabilities Act ("ADA") requires separately accessible kiosks despite Labcorp providing an appropriate auxiliary aid that affords legally blind persons the same ability to check-in as sighted persons. Plaintiffs sought to certify classes of legally blind individuals who "were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to Labcorp's failure to make its e-check-in kiosks accessible to legally blind individuals." App. Ex. A at 3-4. Labcorp argued to the District Court that this is a fail-safe class definition, because the class membership excludes all legally blind persons who did not attempt to, or did not want to, check in with a kiosk, and instead opted to check in at the front desk (as 25% of all Labcorp PSC patients do).

In its recent decision in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) ("*Olean*"), this Court held that "[a district] court may not . . . create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct." *Id.* at 669 n.14.

Here, the District Court did precisely that. It certified classes whose membership is defined only by Plaintiffs' specific theory of legal liability. Appellate review is warranted to allow this Court to provide further guidance to the District Courts by explaining how to recognize fail-safe classes that jettison all "uninjured" persons from proposed class membership, and then claim that the class meets Rule 23's commonality requirements through a commonly alleged injury.

Finally, Labcorp petitions for interlocutory review so that this Court can address the significant and manifest errors of law that led to the District Court's certification of Plaintiffs' classes despite the lack of predominance, manageability, typicality, or superiority required to certify the Rule 23(b)(3) subclass. The District Court did not consider recent Supreme Court precedent in *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2208 (2021), even though, contrary to *TransUnion's* requirements, the record evidence here establishes that a substantial portion of the subclass lacks Article III and Unruh Act standing. Moreover, the Rule 23(b)(2) class was certified even though Plaintiffs did not meet their burden of showing that a common remedy exists to support an injunctive relief class. The manifest legal errors riddling the Order are likely to evade end-of-the-case review. given the settlement pressure that certification orders exert on defendants. *See, e.g., Olean*, 31 F.4th at 685 (Lee, J., dissenting) ("If trials these days are rare, class action trials are almost extinct.").

In summary, absent interlocutory review by this Court, the District Court's Order creates clear conflict within this Circuit, opens the door to fail-safe class definitions that this Court has rejected, and would allow certification of classes based on an incorrect application of the law. Because these issues are of such significant importance that they warrant interlocutory review, Labcorp asks the Court to permit an appeal of the District Court's decision on certification.

## FACTS PERTINENT TO THE PETITION

### A. Labcorp's Patient Service Centers (PSCs)

Labcorp is a diagnostic testing company that, among other things, provides diagnostic testing services to tens of millions of persons annually. While the majority of Labcorp's testing services stem from samples collected at places such as doctor's offices and hospitals, approximately 20% of Labcorp's testing is done on samples collected at around 2,000 PSCs operating throughout the United States, including at around 300 locations in California. *See* App. Ex. D (Joint Appendix Excerpts), JA1062, 1200. Persons who visit PSCs provide samples (i.e. blood and urine) collected by on-site Labcorp phlebotomists for a wide range of diagnostic tests.

Historically, all patients visiting a PSC checked-in with a Labcorp employee at the front desk. Starting in late 2017, Labcorp began installing touchscreen kiosks that provided an option for patients to check-in at an iPad kiosk with an attached

scanner. Simultaneously, Labcorp updated its front-desk check-in capabilities and hardware to make front desk check-in more efficient. *Id.*, JA1071, 1083-84. Because the kiosks would not be accessible to, or preferred by, all patients, Labcorp intentionally retained the option for front desk check-in and indeed enhanced desk check-in capabilities. *Id.*, JA1083-84. At least one employee is always present at each PSC who can operate front desk check-ins as needed. *Id.*, JA1067-70.

Front-desk check-in is Plaintiff American Council of the Blind's ("ACB") (a national advocacy group for the blind) preferred check-in method for legally blind persons. *See id.*, JA1101. And while Plaintiffs' expert opined that kiosks would be "more accessible" to some legally blind persons if the kiosks offered audio alternatives to access visual content, that expert admitted that the technologies she proposes would not make the kiosks accessible to all legally blind people, that she has no information as to legally blind persons' check-in preferences, and that she has no information that checking in via kiosk would be faster for a legally blind person than checking in at the front desk. *Id.*, JA1116-1118.

Tasks that can be performed at the kiosk (i.e. check-in and payment of past invoices) can, and are, routinely performed at the front desk with PSC staff who use a similar technology as that housed in the kiosk. *Id.*, JA1065-66, 1074. Even after the kiosk roll-out, a substantial segment of all PSC patients continued to use the front desk to check-in for appointments. For example, between August 2020 and February

2021, approximately 25% of ***all*** PSC patients checked in at the front desk notwithstanding the availability of check-in kiosks. *Id.*, JA1191.

### B. Plaintiffs' Visits To Labcorp Patient Service Centers

Labcorp has no information as to which of its millions of patients nationwide or in California are legally blind. (Even Plaintiff ACB has no information on how many of its 20,000 members are legally blind (*id.*, JA1090-91)). Nor does Labcorp have any information as to which patients (legally blind or not) first approached a kiosk to attempt to check in, or which ones simply went straight to the desk, were checked in, and thus never interacted or attempted to interact with the kiosk. Over 10.29 million visits to California PSCs occurred between January 2018 and December 2020 alone. App. Ex. D, JA1188.

Neither Plaintiff Vargas, Plaintiff Davis, nor any of ACB's declarants claim that they were denied access to the testing services offered at any PSC, and each was able to check in for and receive testing services. At least one ACB member witness who is "totally blind" and visits a Labcorp PSC every three months, Mr. Harden, testified that he and his legally blind wife have never been asked to use the kiosk and always check in with the front desk, which they prefer (*id.*, JA1103-1109). He commented: "ADA states that a business needs to make reasonable accommodations for the disabled; they certainly do that." *Id.*, JA1107.

Plaintiff Vargas's two PSC visits form the only basis for his California Rule

23(b)(3) claim brought on behalf of the sub-class. Vargas testified that on January 9, 2020 (several months after he had already brought his kiosk-based lawsuit against Quest), he visited a Labcorp PSC in Van Nuys, California, to assess check-in procedures the day before he planned to use the PSC's services. *Id.*, JA0157, 0159. Labcorp's front desk staff informed Vargas that when he arrived for his scheduled services, "[a]ll I needed to do was come to the window or the desk at the date of the appointment, you know, the day that I needed the service, and that they would make someone available to help me with the check-in process." *Id.*, JA0158, 0170-0172. And that is exactly what happened. When Vargas returned the next day, he was checked in by front desk staff, received the blood testing services that he sought from Labcorp, and was not told that he needed to check in at the kiosk. *Id.*, JA0173-74. He never went to the kiosk at all – and was never directed to do so.

Plaintiffs offered an expert report guesstimating that somewhere between 8,861 and 112,400 legally blind Californians per year visited a Labcorp PSC and thus would be in the California Subclass. This would result in potential statutory damages for the proposed Unruh Act subclass (at $4,000 each) of between $35.4 million and $449.6 million *per year*, making total potential damages exceed $1 billion. This report (riddled with faulty logic) was rebutted entirely by Labcorp's expert as based wholly on presumptions and no actual assessment of how many legally blind Californians actually visit Labcorp's PSC. *See id.,* JA1194-1204.

There is no record evidence that even 40 legally blind Californians attempted to, and could not, use Labcorp's check-in kiosks.

### C. The Certified Classes

Without holding a hearing on Plaintiffs' certification motion, on May 23, 2022, the District Court certified the following classes (App Ex. A at 24):

- **Nationwide Injunctive Class**: All legally blind individuals in the United States who visited a LabCorp patient service center in the United States during the applicable limitations period and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals.
- **California Class**: All legally blind individuals in California who visited a LabCorp patient service center in California during the applicable limitations period and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals.

In contrast, in December 2021, a district judge in an almost identical case brought by Vargas, following briefing and oral argument, concluded that even though in that case Vargas was actually directed by Quest **to use its kiosk** to check-in – something that did not happen when he visited Labcorp and was assisted both times at the front desk – no California Subclass for Unruh damages could be certified. App. Ex. B. And that court now has also recognized that the fail-safe nationwide class should not have been certified in light of *Olean*. App. Ex. C (Order, Dkt. 211 in Case No. 2-19-cv-8108).

## QUESTIONS PRESENTED

1. Should this Court grant review to address an intra-circuit inconsistency on when Rule 23(b)(3) Unruh Act damages classes are certifiable?

2. Did the District Court manifestly err in certifying fail-safe classes?

3. Did the District Court manifestly err in certifying Plaintiff Vargas's California sub-class seeking Unruh Act damages when predominance, typicality, manageability, and superiority are lacking, and when there is no evidence that even a majority of class members would have standing to proceed?

4. Did the District Court manifestly err in certifying the nationwide injunctive relief class under Rule 23(b)(2) when there is no evidence that an injunction would provide a remedy to all (or even most) class members?

## STANDARD OF REVIEW

This Court has "'unfettered discretion' to grant or deny permission to appeal based on 'any consideration that the court of appeals finds persuasive.'" *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (quoting Fed. R. Civ. P. 23, Advisory Committee Notes to 1998 Amendments, Subdivision (f)). Review is warranted where the certification order is "manifestly erroneous," or where the appeal will address unsettled and fundamental issues of law related to class actions. *Chamberlan* , 402 F.3d at 959.

This Court reviews a District Court's certification order for abuse of

discretion. *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001). "A court abuses its discretion if its certification order is premised on legal error." *Id.*

## REASONS FOR GRANTING THE PETITION

### I. THE COURT'S CERTIFICATION OF THE UNRUH ACT CALIFORNIA CLASS HAS CAUSED SIGNIFICANT CONFUSION IN THIS CIRCUIT.

The District Court's legal analysis was exactly the opposite of the *Quest* court, which denied certification of the same claims for lack of predominance and superiority. *Compare* App. Exs. A and B. These two diametrically opposed opinions have created complete confusion as to what the law requires.

Labcorp provided the District Court with case law from this circuit, explaining that a claim under the Unruh Act requires each class member to also show that he or she was denied access to assert such a claim on the merits. *See Vondersaar v. Starbucks Corp.*, No. CV 12-05027 DDP AJWX, 2015 WL 629437, at *3 (C.D. Cal. Feb. 12, 2015), *aff'd*, 719 F. App'x 657 (9th Cir. 2018) ("[E]ach class member must show how he or she was personally affected and was denied full and equal access by the defendant."); *see also Moeller v. Taco Bell Corp.*, No. C 2–5849 PJH, 2012 WL 3070863, at *5 (N.D. Cal. July 26, 2012)*; Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000) ("[T]o maintain an action for damages under the Unruh Civil Rights Act, 'an individual must take the additional step of establishing that he or she was denied access on a particular occasion.'"); *Antoninetti v. Chipotle*

*Mexican Grill, Inc.*, No. 6-cv-2671 BTM, 2012 WL 3762440, at *5-6 n.1 (S.D. Cal. Aug. 28, 2012). Such ADA cases demonstrate why the injury requirements of the Unruh Act render a subclass like Plaintiff's uncertifiable: individual issues regarding if, and how, each class member was affected predominate over any common issues.

Months before the district court ruled here, the *Quest* court properly considered these ADA cases to deny certification of the Rule 23(b)(3) class. The *Quest* court noted that, as in the *Moeller, Antonienetti,* and *Vondersaar* cases, the California class proposed by Vargas asserted claims involving hundreds of individual locations, and that "[i]ssues such as whether a patient service center had a fully operative kiosk on the date of a putative class member's visit will therefore require individual inquiries." App. Ex. B at 13. The *Quest* court explained that under Vargas's theory, "each putative class member must show only (1) that he or she is legally blind and (2) that he or she visited a patient service center with a kiosk and without a staffed desk (3) during the class period." *Id.* at 14. But the court held that "demonstrating these basic factual elements will still essentially require each putative class member to litigate her own individual Unruh Act case." *Id.* Finally, with no information for how to narrow down the three million PSC visitors to those who are legally blind, the *Vargas* court determined that class procedures were not superior and that individualized issues predominate. *Id.*

The same legal analysis should have applied with even stronger force to defeat

Vargas' Unruh Act subclass here. Unlike in *Quest*, Labcorp patients' kiosk use was purely optional and Vargas was not instructed to check-in at the kiosks. App. Ex. D., JA0158. Indeed, around 25 percent of all Labcorp patients across all populations check in at Labcorp PSC's at the front desk. *Id.*, JA1191. These patients could not have been "personally affected" or "denied access," and thus cannot assert viable Unruh Act claims. *See, e.g., Moeller*, 2012 WL 3070863, at *5-6; *Vondersaar,* 2015 WL 629437, at *1, 4; *Atoninetti,* 2012 WL 3762440, at *6. Just as in *Quest*, determining which class members have a viable claim will "require each putative class member to litigate her own individual Unruh Act case." App. Ex. B at 14.

The District Court below, without discussing or distinguishing the *Quest* certification order's reasoning or the reasoning of the cases above, held the exact opposite on the law. The District Court concluded that Labcorp's Unruh Act case law was irrelevant because it involved physical barriers to access, and instead relied on *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 575 (N.D. Cal. 2018), a different "construction" case involving alleged access barriers at **one** physical location. As the *Quest* court noted, *Nevarez* involved ADA access claims tied to a single football stadium, and thus had consistent allegations across class members, as well as information for all 3,400 persons who had ordered accessible seating during the class period. App. Ex. B at 13. And notably, as the *Quest* court

recognized, the class that *Nevarez* certified was fail-safe. *Id.*, 5, 13. But the District Court below followed *Nevarez*'s reasoning to certify its own fail-safe classes.

The *Quest* and *Labcorp* class certification orders – issued less than six months apart from the same courthouse – are in conflict. This will cause confusion in Unruh Act cases[1] and beyond. This Court should permit review to resolve this confusion.

## II. THE DISTRICT COURT MANIFESTLY ERRED IN CERTIFYING FAIL-SAFE CLASSES.

The District Court certified classes defined to include only legally blind persons who were denied access "due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals." This is a "fail safe" class because it presupposes success on the merits, so that anyone not denied access because of the check-in kiosks is out of the class. *See, e.g., Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017) ("A fail-safe class is commonly defined as limiting membership to plaintiffs described by their theory of liability in the class definition such that the definition presupposes success on the merits." (internal citations omitted)). Fail safe classes cannot be certified. *See Olean*, 31 F.4th at 669 n.14.

The District Court had before it (1) Labcorp's argument that the class definitions were fail-safe, (2) Judge Gee's opinion holding that the almost identical

[1] A docket search shows at least seventeen (17) other pending class action cases in this Circuit that have Unruh damages subclasses, in addition to the Quest and Labcorp actions discussed in this petition.

definitions before her in the Quest case were fail-safe, and (3) the *Olean* decision from this Court reminding lower courts that fail-safe classes are improper and should not be certified. Nonetheless, the District Court certified two fail-safe classes.

The District Court's certification of fail-safe classes is a manifest legal error that warrants interlocutory review – review that will benefit courts in this district by permitting this Court to explain how to recognize and deal with fail-safe class definitions such as those the District Court certified here. Indeed, Plaintiffs are likely to argue here (as they have in a pending motion to the District Court in the *Quest* case) that their fail-safe class definition can somehow simply be "refined" to comply with *Olean*, but a new class definition that provides a new kind of fail-safe definition (or one that excludes Plaintiffs from their own classes) is not proper either, as guidance from this Court can make clear.

## III. THE DISTRICT COURT MANIFESTLY ERRED IN CERTIFYING THE RULE 23(B)(3) UNRUH ACT DAMAGES SUBCLASS.

### A. The District Court manifestly erred in failing to consider evidence that many Rule 23(b)(3) damages class members would lack standing to proceed.

As the United States Supreme Court recently held, "under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC*, 141 S. Ct. at 2205 (emphasis in original). This Court recently recognized *TransUnion's* directive that "[e]very class

member must have Article III standing in order to recover individual damages," and cautioned: "Rule 23 also requires a district court to determine whether individualized inquiries into this standing issue would predominate over common questions." *Olean*, 31 F.4th at 669 n.12 (quoting *TransUnion*, 141 S.Ct. at 2208).[2]

Plaintiff Vargas himself – the sole representative of the Unruh Act subclass – experienced no cognizable injury because he never even tried to interact with the kiosk and instead was serviced at the PSC check-in desk. "[A] plaintiff in an ADA case may establish standing 'either by demonstrating deterrence or by demonstrating injury-in-fact coupled with an intent to return to a noncompliant facility.'" *Gomez v. Como*, 2022 WL 1082016, *1 (C.D. Cal. Apr. 11, 2022) (quoting *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011)). In *Chapman*, the Ninth Circuit explained that to establish an injury-in-fact, a plaintiff must encounter a barrier that "affects the plaintiff's full and equal enjoyment of the facility on account of his particular disability." *Id.* at 947.

Vargas cannot satisfy Article III's injury-in-fact requirement for federal court

---

[2] In *Olean*, the *en banc* majority upheld a certification order, finding that Plaintiff's expert had offered sufficient evidence of classwide injury in an antitrust case to get past the certification stage. *See Olean*, 31 F.4th at 680-682. Three justices dissented, opining that the defense expert was credible, and had offered evidence that 28% of class members were not injured; that anything more than a *de minimus* amount of persons lacking Article III standing should doom certification; and that the district court should have addressed this "battle of the experts" during the certification proceedings. *Id.* at 692 (dissent).

jurisdiction. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016). He was neither deterred from using Labcorp's testing services nor did he suffer any injury-in-fact that is "concrete and particularized." *Id.* at 339 (internal quotations omitted). To the contrary, on the only two occasions that Vargas visited a Labcorp PSC (once to inquire into the PSC's processes, and once to have medical testing), he was never directed to use – or attempted to use – the kiosk.

Indeed, there is **no record evidence** that Vargas, or anyone else in the Unruh Act class, was deprived of accessing the medical testing services offered by Labcorp's California PSCs. Thus, there is no evidence that the certified class contains a majority of persons (or even a substantial number of persons) with Article III standing. On the other hand, there is undisputed record evidence that around 25% of all Labcorp PSC visitors choose to check-in at the front desk, and thus could not have suffered injury required to assert Unruh Act claims tied to the kiosk. And Plaintiffs have adduced no evidence to indicate how that 25% overall percentage of desk check-ins may be affected (and perhaps increase) among legally blind patients.

The court disregarded *TransUnion* and *Olean* in failing to address this lack of Article III standing – even though Labcorp specifically addressed the anticipated *TransUnion* decision in its briefing, and provided the decision to the District Court when it issued. Standing in class actions is an important issue warranting review, and district courts would benefit from further guidance on applying *TransUnion*.

### B. The District Court manifestly erred in finding predominance, typicality manageability, and superiority for the California subclass.

There simply is not a uniform experience at check-in: kiosk check-in is not mandatory at Labcorp PSCs, as Labcorp testified (Dkt. 66-1 at 21-22), as Plaintiff Vargas and ACB members also confirmed (*id*. at 40, 41 n.10), and as Labcorp's own statistics demonstrate (*id.* at 21 (25.4% of all Labcorp PSC customers check in at the desk)). Different PSCs have different front-desk set ups and staffing, but there is always an on-site employee (whether a phlebotomist, a dedicated receptionist, or a dedicated Walgreens staff member) who can perform the check-in from the front desk. *Id.* at 21-22, 48. The different experiences of different persons, and determining who would even be legally blind, create individualized inquiries that swamp any common issues, as the *Quest* court recognized even when Quest's check in process (unlike Labcorp's) required Plaintiff Vargas to check in at a kiosk (with assistance). It was manifest error to find that predominance supported certification.

Moreover, in certifying the fail-safe California Class, the District Court dismissed typicality challenges. As Labcorp explained, Plaintiff Vargas failed to provide evidence that his preferred screen-reader software at the check-in kiosk would remedy the alleged harm he seeks to redress for all the legally blind California residents he seeks to represent. Thus, as a matter of law the trial court had no basis for finding that typicality requirements had been met, particularly when ACB's

representative testified that front-desk check in was a preferred option for blind patrons. *See* App. Ex. D, JA1101. Labcorp should have the opportunity to explain to this Court the trial court's abuse of discretion in finding typicality.

Similarly, the trial court erred in dismissing any manageability concerns. There is no record evidence regarding which persons visiting California PSCs are legally blind. Plaintiffs have proposed no way of identifying this population, and Labcorp is not aware of any method. The District Court brushed off this concern, stating that these issues can be determined "at a later stage of the proceedings" and "would not be an unduly burdensome task." App. Ex. A at 24. But it was Plaintiffs' burden to demonstrate that class procedures are superior. "Whether a class action will be manageable 'is, by ... far, the most critical concern in determining whether a class action is a superior means of adjudication.'" *Lara v. First Nat'l Ins. Co. of Am.,* 25 F.4th 1134, 1138 (9th Cir. 2022) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4.72 (5th ed. Supp. 2021)).

And, in another split with the *Quest* court that will engender confusion in the lower courts, the District Court held that as a matter of law, the Unruh Act's statutory damages of $4,000 per incident were minimal and weighed in favor of certification, so as to make class procedures superior. App. Ex. A at 23 (citing *Nevarez,* 326 F.R.D. at 577). But the *Quest* court, and other California district courts it cited, held the opposite, finding that $4,000 per incident statutory damages were sufficient

damages to weigh against finding class procedures superior. This is a question of law on which the District Court erred. Because two courts reached opposite conclusions on superiority, this Court should provide guidance.

## IV. THE DISTRICT COURT MANIFESTLY ERRED IN CERTIFYING THE NATIONWIDE CLASS.

Finally, the Court should also grant permission for Labcorp's appeal so that it can consider the certification of the nationwide injunctive class not just for its fail-safe definition, but for Plaintiffs' failure to articulate a concrete remedy to be achieved by an injunction. In ADA class actions, putative class plaintiffs generally seek injunctions that would remove physical barriers to access services (i.e. access ramps of a specific grade, or lower counters at a certain height). Here, on the other hand, legally blind patients are able to enter PSCs and receive the testing services Labcorp provides. Plaintiffs have articulated no proposed "fix" to the check-in kiosks that would make touch-screen kiosks accessible to all legally blind persons, which Labcorp's desk check-in process already does through the use of a qualified reader and check-in equipment at the desk. *See* App. Ex. D, JA1099-1100 (ACB's representative agreeing that a kiosk upgrade would not resolve accessibility concerns of all visually impaired persons); JA0851 (Plaintiffs' expert admitting same).

An injunctive class should not be certified where there is no injunction that will provide a remedy to all class members. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("In other words, Rule 23(b)(2) applies only when a single

injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.").

The evidence before the court was clear that even the three named Plaintiffs and a handful of potential class members who have been deposed disagree on what "remedy" could make PSCs fully accessible to legally blind persons, if the kiosk is indeed an accessibility issue. Plaintiff ACB conceded that an in-person check-in is appropriate; Plaintiffs Davis and Vargas preferred a technological solution at the kiosk; ACB member Harden prefers to check-in at the front desk. *See* App. Ex. D, JA1101, 0158, 1103-1107. As ACB's own 30(b)(6) witness testified: "No two people with a visual impairment need the same accommodation." *Id.*, JA1092, 1099-1100. Because an injunction forcing changes to the PSC kiosks will not provide a remedy to all class members, it was manifest error to certify a Rule 23(b)(2) class.

## CONCLUSION

For the foregoing reasons, this Court should exercise its discretion under Rule 23(f) and grant immediate review of the District Court's class certification order.

Date: June 6, 2022

Respectfully submitted,

*/s/ Robert I. Steiner*
Robert I. Steiner
Becca Wahlquist

*Counsel for Petitioner Labcorp Corporation of America Holdings*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 5(c) of the Federal Rules of Appellate Procedure, I certify that, according to the word count on the computer program used to prepare this Petition, and excluding the information in the Petition required by Rule 5(b)(1)(E) and Rule 32(f), this Petition contains 4,917 words and is no more than 20 pages in length.

Date: June 6, 2022

Respectfully submitted,

*/s/ Robert I. Steiner*
Robert I. Steiner
Becca Wahlquist

*Counsel for Petitioner Laboratory Corporation of America Holdings*

## CERTIFICATE OF SERVICE

I certify that on June 6, 2022, I electronically filed the foregoing petition and exhibits with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that on the same day, I caused the petition to be served by email and by commercial carrier for next-day delivery upon the following:

Jonathan D. Miller, Esq.
Alison M. Bernal, Esq.
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Tel: (805) 963-2345
Fax: (805) 284-9590
jonathan@nshmlaw.com
alison@nshmlaw.com

Matthew K. Handley, Esq.
HANDLEY FARAH & ANDERSON PLLC
200 Massachusetts Avenue, NW
Seventh Floor
Washington, DC 20001
Tel: (202) 559-2411
Fax: (844) 300-1952
mhandley@hfajustice.com

Benjamin J. Sweet, Esq.
NYE, STIRLING, HALE & MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Tel: (412) 857-5350
ben@nshmlaw.com

Attorneys for Plaintiffs-Respondents, LUKE DAVIS, JULIAN VARGAS, AMERICAN COUNCIL OF THE BLIND, and the Proposed Class

**CHAMBERS COPIES:**
Honorable Fernando M. Olguin
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
United States Courthouse
350 West 1st Street
6th Floor, Courtroom 6D
Los Angeles, California 90012

/s/ Kirstin E. Largent

No. 22-_______________

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,

*Plaintiffs-Respondents*,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, and DOES 1-10, inclusive,

*Defendant-Petitioner.*

---

Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:20-cv-00893-FMO-KS
The Honorable Fernando M. Olguin

---

**EXHIBITS IN SUPPORT OF LABCORP'S RULE 23(f) PETITION FOR PERMISSION TO APPEAL ORDER GRANTING CLASS CERTIFICATION**

---

Robert I. Steiner
rsteiner@kelleydrye.com
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
212-808-7800

Becca J. Wahlquist
bwahlquist@kelleydrye.com
KELLEY DRYE & WARREN LLP
350 South Grand Avenue, Suite 3800
Los Angeles, California 90071
213-547-4900

Attorneys for Petitioner
LABORATORY CORPORATION OF AMERICA HOLDINGS

# APPENDIX

**<u>Exhibit</u>**

District Court Order Certifying Classes [Dkt. 97] .................................................... A

Certification Order in *Vargas v. Quest Diagnostics Clinical Labs* [Dkt. 190] ........ B

May 11, 2022 Order in *Vargas v. Quest Diagnostics* [Dkt. 211] ............................. C

Excerpts from Joint Appendix filed with Class Certification briefing ..................... D

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, et al., Plaintiffs, v. LABORATORY CORPORATION OF AMERICA HOLDINGS, Defendant. | Case No. CV 20-0893 FMO (KSx) **ORDER RE: MOTION FOR CLASS CERTIFICATION** |

Having reviewed and considered all the briefing filed with respect to plaintiffs' Motion for Class Certification, (Dkt. 66, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b); Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

**BACKGROUND**[1]

On January 28, 2020, Luke Davis ("Davis") and Julian Vargas ("Vargas" and together with Davis, "plaintiffs") filed this putative class action. (See Dkt. 1, Class Action Complaint). On September 3, 2020, plaintiffs and the American Council of the Blind ("ACB") filed the operative First Amended Class Action Complaint ("FAC"), (Dkt. 40), against Laboratory Corporation of America Holdings ("defendant" or "LabCorp"), asserting claims for violations of: (1) the Americans

[1] Capitalization, quotation marks, punctuation, and emphasis in record citations may be altered without notation.

with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq.; (2) California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, et seq.; (3) California's Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, et seq.;[2] (4) Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794(a); and (5) Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 8116. (Dkt. 40, FAC at ¶¶ 41-95). The Unruh Act and CDPA claims are brought by Vargas on behalf of himself and a putative California class, (see id. at ¶¶ 60-73), while the remaining federal claims are brought by plaintiffs on behalf of the Nationwide Injunctive Class. (See id. at ¶¶ 41-59, 74-95). Plaintiffs seek declaratory and injunctive relief, statutory damages, and attorney's fees. (See id. at Prayer for Relief). Plaintiffs do "not seek class recovery for actual damages, personal injuries or emotional distress that may have been caused by defendant's conduct[.]" (Id. at ¶ 36).

Plaintiffs allege that LabCorp discriminates against them and other visually impaired individuals, "by refusing and failing to provide auxiliary aids and services to Plaintiffs, and by requiring [them] to rely upon other means of communication that are inadequate to provide equal opportunity to participate in and benefit from Defendant's health care services free from discrimination." (Dkt. 40, FAC at ¶¶ 1-2). Plaintiffs allege that they visited LabCorp's patient services centers ("PSCs") "and were denied full and equal access as a result of defendant's inaccessible touchscreen kiosks for self-service check-in." (See id. at ¶¶ 4, 21-22). According to plaintiffs, the touchscreen kiosks "do not contain the necessary technology that would enable a person with a visual impairment to [a] enter any personal information necessary to process a transaction in a manner that ensures the same degree of personal privacy afforded to those without visual impairments; or [b] use the device independently and without the assistance of others in the same manner afforded to those without visual impairments." (Id. at ¶ 5). Indeed, "Plaintiffs were informed by staff of defendant that the kiosks are not accessible to the blind." (Id.). As a result, "plaintiffs, members of [] ACB, [a national membership organization of approximately 20,000 blind and visually impaired persons,] and all other visually impaired individuals are forced

[2] Plaintiffs concede that their claim under the CDPA cannot be maintained, and request that the court dismiss it pursuant to Federal Rule of Civil Procedure 41(a)(2). (See Dkt. 84, Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Motion for Summary Judgment [] at 5 n. 2). Accordingly, the court will not address any arguments regarding the CDPA claim.

to seek the assistance of a sighted person, and thereafter divulge their personal medical information to that sighted person in a nonconfidential setting in order to register." (Id. at ¶¶ 5, 16).

LabCorp has approximately 2,000 PSCs throughout the country, 299 of which are located in California. (Dkt. 82, Exh. 32 (Deposition of Joseph Sinning) ("Sinning Depo") at JA1062). In October 2017, LabCorp launched "Project Horizon" to roll out check-in kiosks at its PSCs. (Id. at JA1071). In preparation for Project Horizon, LabCorp considered proposals from two companies for the kiosks. (Dkt. 80, Exh. 18 (Wright Depo) at JA477); (Dkt. 80, Exh. 26 at JA711-714). Although one of the companies proposed to provide kiosks that were ADA compliant, LabCorp selected the company, Alia, that did not provide ADA compliant kiosks. (Dkt. 80, Exh. 18, Deposition of Mark Wright ("Wright Depo") at JA464, JA477).

Approximately 1,853 PSCs nationwide have check-in kiosks, 280 of which are in California. (Dkt. 82, Exh. 32 (Sinning Depo) at JA1064). According to LabCorp, the "kiosks are only available for use during normal business hours, when there is also at least one employee present at each PSC who can operate front desk check ins as needed." (Id. at JA1065-66).

With respect to the instant Motion, plaintiffs seek an order certifying the following class and subclass pursuant to Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure:[3]

> All legally blind individuals in the United States who visited a LabCorp patient service center in the United States and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals. ["Nationwide Injunctive Class" or "Rule 23(b)(2) Class"]

> All legally blind individuals in California who visited a LabCorp patient service center in California and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to

[3] All "Rule" references are to the Federal Rules of Civil Procedure unless otherwise indicated.

> LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals. ["California Class" or "Rule 23(b)(3) Class"].

(Dkt. 66, Motion at 2); (Dkt. 66-1, Joint Brief Concerning Plaintiff's Motion for Class Certification ("Joint Br.") at 30).

## LEGAL STANDARD

Rule 23 permits a plaintiff to sue as a representative of a class if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions or law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Courts refer to these requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation[.]" Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012). In addition to fulfilling the four prongs of Rule 23(a), the proposed class must meet at least one of the three requirements listed in Rule 23(b). See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548 (2011).

"Before it can certify a class, a district court must be satisfied, after a rigorous analysis, that the prerequisites of both Rule 23(a) and" the applicable Rule 23(b) provision have been satisfied. Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods L.L.C., 31 F.4th 651, 664 (9th Cir. 2022) (en banc) (internal quotation marks omitted). A plaintiff "must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." Id. at 665.

On occasion, the Rule 23 analysis "will entail some overlap with the merits of the plaintiff's underlying claim[,]" and "sometimes it may be necessary for the court to probe behind the pleadings[.]" Dukes, 564 U.S. at 350-51, 131 S.Ct. at 2551 (internal quotation marks omitted). However, courts must remember that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S.

455, 466, 133 S.Ct. 1184, 1194-95 (2013); see id., 133 S.Ct. at 1195 ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites . . . are satisfied."); Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 n. 8 (9th Cir. 2011) (The court examines the merits of the underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims. . . . To hold otherwise would turn class certification into a mini-trial.") (citations omitted). Finally, a court has "broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." United Steel, Paper & Forestry, Rubber Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co., 593 F.3d 802, 810 (9th Cir. 2010) (internal quotation marks omitted); see also Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1092 (9th Cir. 2010) (The decision to certify a class and "any particular underlying Rule 23 determination involving a discretionary determination" is reviewed for abuse of discretion.).

## DISCUSSION

I. RULE 23(a) REQUIREMENTS.

A. Numerosity.

A putative class may be certified only if it "is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "Although the size of the class is not the sole determining factor, . . . where a class is large in numbers, joinder will usually be impracticable." A.B. v. Hawaii State Department of Education, 30 F.4th 828, 835 (9th Cir. 2022) (internal quotation marks omitted); see Jordan v. Cty. of Los Angeles, 669 F.2d 1311, 1319 (9th Cir.), vacated on other grounds by Cty. of Los Angeles v. Jordan, 459 U.S. 810, 103 S.Ct. 35 (1982) (class sizes of 39, 64, and 71 are sufficient to satisfy the numerosity requirement). "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members[.]" Slaven v. BP Am., Inc., 190 F.R.D. 649, 654 (C.D. Cal. 2000); see Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 473-74 (C.D. Cal. 2012) (same).

Based on plaintiffs' expert's analysis, plaintiffs contend that "there are at least 87,500 legally blind class members nationwide" and "at least 8,861 legally blind class members in California."

(Dkt. 66-1, Joint Br. at 33); (Dkt. 81, Exh. 27 (Sean Chasworth Report) at JA722). In addition, plaintiffs rely on LabCorp's survey responses, which indicate that LabCorp received over 60 complaints from persons with low or no vision having difficulty using the kiosks. (See Dkt. 66-1, Joint Br. at 33). Additionally, according to plaintiffs, LabCorp has records showing that there were more than 130 complaints nationwide from individuals with low or no vision who claimed they could not use the kiosks. (See id. at 33-34).

With respect to the California Class, LabCorp contends that the "survey responses . . . cannot satisfy the numerosity requirement" because of the 23 responses, four praised the kiosks, "leav[ing] only 19 potential California class members identified in those responses, not all of which may be legally blind[.]"[4] (Dkt. 66-1, Joint Br. at 35). However, given the number of complaints, and "[b]ecause not every patient will lodge a complaint[,] . . . it is highly unlikely that the[] complaints [and survey responses] reflect every individual who encountered" accessibility issues with the kiosks. See Vargas v. Quest Diagnostic Clinical Labs., 2021 WL 5989958, *5 (C.D. Cal. 2021) ("Quest"). Thus, the court finds that plaintiffs have met the numerosity requirement as to the California Class.

With respect to the Nationwide Injunctive Class, LabCorp does "not dispute that there is a likelihood of at least 40 instances nationwide of some legally blind individuals who might claim that they have had difficulty using a kiosk for check-in[.]" (Dkt. 66-1, Joint Br. at 34). Instead, it takes issue with whether the individuals actually fall within the class definition since they were "not

---

[4] LabCorp also claims, without any supporting argument, that the responses to its own survey are "inadmissible and unsworn[.]" (Dkt. 66-1, Joint Br. at 35). As an initial matter, defendant's reference to "inadmissible and unsworn" survey responses "is too cursory and undeveloped for the Court to fully understand and consider[.]" See Wyles v. Sussman, 2019 WL 3249590, *3 (C.D. Cal. 2019); see also Beasley v. Astrue, 2011 WL 1327130, *2 (W.D. Wash. 2011) ("It is not enough merely to present an argument in the skimpiest way, and leave the Court to do counsel's work – framing the argument, and putting flesh on its bones through a discussion of the applicable law and facts."). Further, putting aside the fact that LabCorp itself relies on its own survey responses in support of its own argument, (see Dkt. 66-1, Joint Br. at 35), LabCorp's argument is unpersuasive because "[i]nadmissibility alone is not a proper basis to reject evidence submitted in support of class certification." Sali v. Corona Regional Medical Center, 909 F.3d 996, 1004 (9th Cir. 2018); see Vargas v. Quest Diagnostic Clinical Labs., 2021 WL 5989958, *4 n. 3 (C.D. Cal. 2021) (The "Ninth Circuit does not require that evidence submitted in connection with a class certification motion be admissible.").

denied service – the medical testing services PSCs provide[.]" (Id.). However, this is a merits question which the court declines to address here. As such, the court finds that plaintiffs have met the numerosity requirement as to the Nationwide Injunctive Class.

B. Commonality.

Commonality is satisfied if "there are common questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). It requires plaintiffs to demonstrate that their claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see also Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (explaining that the commonality requirement demands that "class members' situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief") (internal quotation marks omitted). "The plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." Mazza, 666 F.3d at 588 (internal quotation marks omitted). "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir. 2013) (emphasis and internal quotation marks omitted); see Mazza, 666 F.3d at 589. Proof of commonality under Rule 23(a) is "less rigorous" than the related preponderance standard under Rule 23(b)(3). See Mazza, 666 F.3d at 589 (characterizing commonality as a "limited burden[,]" stating that it "only requires a single significant question of law or fact[,]" and concluding that it remains a distinct inquiry from the predominance issues raised under Rule 23(b)(3)). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

Here, plaintiffs contend there are several common questions, including whether: (1) "LabCorp's kiosks are independently accessible to legally blind individuals"; (2) "LabCorp has implemented the inaccessible check-in kiosks system across its national network of more than

1,800 PSCs"; (3) "LabCorp trained its employees that use of the kiosks to check-in was mandatory"; (4) "use of the kiosk is a good or service LabCorp offers its customers"; (5) "LabCorp offers a qualified aid or auxiliary service to allow legally blind individuals to access the check-in kiosk service"; and (6) "LabCorp has remedied the inaccessible check-in kiosk across its system." (Dkt. 66-1, Joint Br. at 37). LabCorp "does not dispute that there is at least one common question of law at issue here."[5] (Id.). The court agrees. See, e.g., Quest, 2021 WL 5989958, at *5 (finding plaintiff satisfied commonality based on similar questions).

C. Typicality.[6]

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." Wolin, 617 F.3d at 1175 (internal quotation marks omitted). "The requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017) (internal quotation marks omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Wolin, 617 F.3d at 1175 (internal quotation marks omitted). The typicality requirement is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1019 (9th Cir. 2011), abrogated on other

---

[5] LabCorp contends that as to the Nationwide Injunctive Class, there is no single injunction or declaration that will provide relief to the class as a whole. (See Dkt. 66-1, Joint Br. at 37-38). However, as LabCorp appears to recognize, that issue should be addressed as part of assessing the Rule 23(b)(2) factors. (See id. at 38). Similarly, with respect to the California Class, LabCorp contends only that common issues do not predominate. (Id.).

[6] Because the Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge[,]" General Tel. Co. of the SW v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2371 n. 13 (1982), the court hereby incorporates the Rule 23(a) commonality discussion set forth above. See supra at § I.B.

grounds in Comcast Corp. v. Behrend, 569 U.S. 27, 133 S.Ct. 1426 (2013) (internal quotation marks omitted).

Here, Davis and Vargas have the same claims as the absent class members. (See Dkt. 40, FAC at ¶¶ 41-95). Both are legally blind and seek to represent classes of other legally blind individuals who, like them, encountered allegedly inaccessible kiosks at LabCorp's PSCs. (See Dkt. 79, Exh. 13 (Deposition of Vargas) ("Vargas Depo") at JA150); (Dkt. 79, Exh. 14 (Deposition of Luke Davis ("Davis Depo") at JA228); (Dkt.66-1, Joint Br. at 30) (class definitions). As such, their claims are typical of the claims of the class. See Fed. R. Civ. P. 23(a)(3); Stearns, 655 F.3d at 1019 ("[E]ach class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.").

Nonetheless, LabCorp contends that plaintiffs "failed to provide sufficient evidence that their own preference is typical for all the legally blind individuals they seek to represent, or that proposed class members suffered any injury related to inability to check-in on the kiosk." (Dkt. 66-1, Joint Br. at 39). However, LabCorp ignores typicality's permissive standard, see Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014) ("Under the rule's permissive standards, representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.") (internal quotation marks omitted), and the Ninth Circuit's admonition that courts may "not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." Id. (citation and internal quotation marks omitted); see, e.g., id. at 686 ("It does not matter that the named plaintiffs may have in the past suffered varying injuries or that they may currently have different health care needs; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each []other or to every class member.").

Moreover, the scope and extent of any proposed injunction has yet to be litigated, and thus, there is no basis to conclude that plaintiffs will seek an injunction covering only their "own preference[s.]" In any event, the court is confident that, assuming liability is established, it can, after obtaining the parties' input, fashion an appropriate injunction.

D. Adequacy.

Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A two-prong test is used to determine adequacy of representation: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Ellis, 657 F.3d at 985 (internal quotation marks omitted). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." Id. The adequacy of counsel is also considered under Rule 23(g).

Here, LabCorp challenges only the adequacy of plaintiffs, as it relates to the Rule 23(b)(2) class. (See Dkt. 66-1, Joint Br. at 42-43) (contending plaintiffs are inadequate "where a single injunction could not resolve all issues"). Because LabCorp "incorporates its challenges to Plaintiffs' typicality[,]" (id. at 42), the court rejects it for the reasons set forth above. See supra at § I.C.

In any event, the court finds this factor is satisfied. There are no known conflicts between the absent class members and plaintiffs and their counsel. (See Dkt. 66-1, Joint Br. at 42). Plaintiffs have vigorously pursued this action on behalf of the two classes, participated in discovery, including by each submitting to deposition, and will appear and testify at trial if necessary. (Dkt. 79, Exh. 13 (Vargas Depo) at JA203-206) (testifying regarding his role in this litigation and the reasons for pursuing the claims asserted); (Dkt. 79, Exh. 14 (Davis Depo) at JA336-40) (same as to the Nationwide Injunctive Class). Further, plaintiffs' counsel are experienced, (Dkt. 79, Exh. 2 (Declaration of Jonathan D. Miller) ("Miller Decl.") at ¶¶ 15-19) (outlining counsel's experience); (Dkt. 17, Exh. 3 (Declaration of Matthew K. Handley) ("Handley Decl.") at ¶¶ 10-13) (outlining counsel's experience), and have prosecuted this action vigorously.

II. RULE 23(b) REQUIREMENTS.

A "proposed class or subclass must also satisfy the requirements of one of the sub-sections of Rule 23(b), which defines three different types of classes." Parsons, 754 F.3d at 674 (9th Cir.

2014) (internal quotation marks omitted). Here, plaintiffs seek certification under Rule 23(b)(2) and (b)(3). (Dkt. 66-1, Joint Br. at 30) (class definitions)

A. Rule 23(b)(2) Requirements – Nationwide Injunctive Class.

A class may be maintained under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Dukes, 564 U.S. at 360, 131 S.Ct. at 2557. This provision applies "only when a single injunction or declaratory judgment would provide relief to each member of the class." Id. "It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." Id. "Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages. " Id. at 360-61, 131 S.Ct. at 2557. "Thus, 23(b)(2) sets forth two basic requirements. First, the party opposing the class must have acted, refused to act, or failed to perform a legal duty on grounds generally applicable to all class members. Second, final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, [must be] appropriate." 2 Newberg on Class Actions § 4:26 (5th ed. 2014) (internal quotation marks omitted).

Plaintiffs seek to certify a Rule 23(b)(2) class with respect to their federal claims, particularly the ADA claim. (See Dkt. 66, Motion at 2). LabCorp does not dispute that it "has acted or refused to act on grounds that apply generally to the class[.]" Fed. R. Civ. P. 23(b)(2); (see, generally, Dkt. 66-1, Joint Br. at 43-45). Instead, it challenges only the second Rule 23(b)(2) requirement, arguing that a single injunction will not provide relief to each member of the class.
(See Dkt. 66-1, Joint Br. at 43-45). LabCorp claims that ACB's Rule 30(b)(6) witness, Claire Stanely, "acknowledge[d] that the injunction Plaintiffs seek would not provide relief to each member of the class."[7] (Id. at 44). Stanley, however, did not testify that a single injunction or remedy would not render the kiosks accessible. (See, generally, Dkt. 82, Exh. 35 (Stanley Depo)

---

[7] LabCorp makes a similar argument regarding plaintiffs' accessibility expert, Rachael Bradley Montgomery. (See Dkt. 66-1, Joint Br. at 44).

at JA1099-1100). Rather, when asked whether providing "speech output" would "resolve the accessibility concerns of everyone that is blind or visually impaired[,]" Stanley testified that "[n]o one accommodation is going to accommodate every person everywhere." (Id. at JA1099). In other words, Stanley's testimony does not mean that an injunction cannot be crafted that will be generally applicable to the class as a whole. See Parsons, 754 F.3d at 688 (The Rule 23(b)(2) indivisibility requirement is "unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole.")

LabCorp appears to be "exaggerate[ing] what is required under Rule 23(b)(2)[,]" Nightingale v. U.S. Citizenship and Immigration Services, 333 F.R.D. 449, 463 (N.D. Cal. 2019), because LabCorp's conduct need not have injured all class members in exactly the same way. In other words, "[t]he fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." Rodriguez v. Hayes, 591 F.3d 1105, 1125 (9th Cir. 2010); see Parsons, 754 F.3d at 688 (The Rule 23(b)(2) "inquiry does not require an examination of the viability or bases of the class members' claims for relief, . . . and does not require a finding that all members of the class have suffered identical injuries."). "[I]t is sufficient to meet the requirements of Rule 23(b)(2) that class members complain of a pattern or practice that is generally applicable to the class as a whole." Rodriguez, 591 F.3d at 1125 (internal quotation marks omitted).

Moreover, as the Ninth Circuit has made clear, "the primary role of [Rule 23(b)(2)] has always been the certification of civil rights class actions." Parsons, 754 F.3d at 686. In a civil rights action, the fact that the discriminatory conduct may have affected different members of the class in different ways does not prevent certification under Rule 23(b)(2). See, e.g., Gibson v. Local 40, Supercargoes and Checkers, 543 F.2d 1259, 1264 (9th Cir. 1976) ("A class action may be maintained under [Rule] 23(b)(2) alleging a general course of racial discrimination by an employer or union, though the discrimination may have . . . affect[ed] different members of the class in different ways."). Here, there is no dispute that this case constitutes a typical civil rights class action. As one court in this District stated, in addressing nearly identical class claims against

another company that provides diagnostic testing services, this case is "a civil rights action against a party charged with unlawful, class-based discrimination based on the use of a specific auxiliary aid or service, and is a prime candidate for 23(b)(2) certification." Quest, 2021 WL 5989958, at *7. In short, the court finds that certification of the Nationwide Injunctive Class is appropriate under Rule 23(b)(2). See id.

B. Rule 23(b)(3) Requirements – California Class.

Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." Hanlon, 150 F.3d at 1022 (internal quotation marks omitted). Fed. R. Civ. P. 23(b)(3) requires two different inquiries, specifically a determination as to whether: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**1. Predominance.**

"Though there is substantial overlap between [the Rule 23(a)(2) commonality test and the Rule 23(b)(3) predominance test], the 23(b)(3) test is far more demanding[.]"[8] Wolin, 617 F.3d at 1172 (internal quotation marks omitted). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249 (1997). "This calls upon courts to give careful scrutiny to the relations between common and individual questions in a case." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453, 136 S.Ct. 1036, 1045 (2016). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses

---

[8] Given the substantial overlap between Rule 23(a) and Rule 23(b)(3), and to minimize repetitiveness, the court hereby incorporates the Rule 23(a) discussion set forth above. See supra at § I.B.

peculiar to some individual class members." Id. (citations and internal quotation marks omitted); see Wang v. Chinese Daily News, Inc., 737 F.3d 538, 545 (9th Cir. 2013) ("The predominance analysis under Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case and tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation.") (internal quotation marks omitted). The class members' claims do not need to be identical. See Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir. 2001) (allowing "some variation" between class members); Abdullah, 731 F.3d at 963 (explaining that "there may be some variation among individual plaintiffs' claims") (internal quotation marks omitted). The focus is on whether the "variation [in the class member's claims] is enough to defeat predominance under Rule 23(b)(3)." Local Joint Exec. Bd. of Culinary/Bartender Trust Fund, 244 F.3d at 1163; see Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975) ("[C]ourts have taken the common sense approach that the class is united by a common interest in determining whether defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions[.]").

Where, as here, a plaintiff's claims arise under state law, the court "looks to state law to determine whether the plaintiffs' claims – and [defendant's] affirmative defenses – can yield a common answer that is 'apt to drive the resolution of the litigation.'" Abdullah, 731 F.3d at 957 (quoting Dukes, 564 U.S. at 350, 131 S.Ct. at 2551); Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809, 131 S.Ct. 2179, 2184 (2011) ("Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action.") (internal quotation marks omitted).

The Unruh Act provides that "[a]ll persons within the jurisdiction of [California] are free and equal, and no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). The California Supreme Court has stated that the purpose of the Unruh "Act is to create and preserve a nondiscriminatory environment in California business establishments by banishing or eradicating arbitrary, invidious discrimination by such

establishments." White v. Square, Inc., 7 Cal.5th 1019, 1025 (2019) (internal quotation marks omitted). "In enforcing the [Unruh] Act, courts must consider its broad remedial purpose and overarching goal of deterring discriminatory practices by businesses" and construe it "liberally in order to carry out its purpose." Id. (citations and internal quotation marks omitted).

"In general, a person suffers discrimination under the [Unruh] Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services." White, 7 Cal.5th at 1023; Thurston v. Omni Hotels Mgmt. Corp., 69 Cal.App.5th 299, 307-08 (2021) (holding that plaintiff, who was blind, "had to show a 'bona fide intent'" to use defendant's services) (quoting White, 7 Cal.5th at 1032). "While . . . an Unruh Act claimant need not be a client or customer of the covered public accommodation, and . . . he or she need not prove intentional discrimination upon establishing an ADA violation," a "claimant's intent or motivation for visiting the covered public accommodation is []relevant to a determination of the merits of his or her claim." Thurston, 69 Cal.App.5th at 309.

"As part of the 1992 reformation of state disability law, the [California] Legislature amended the Unruh [] Act to incorporate by reference the ADA, making violations of the ADA per se violations of the Unruh [] Act." Jankey v. Lee, 55 Cal.4th 1038, 1044 (2012). "To prevail on a discrimination claim under Title III [of the ADA], a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of his disability." Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc., 603 F.3d 666, 670 (9th Cir. 2010).

Under the Unruh Act, "[w]hoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 . . . is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000)[.]" "The litigant need not prove she suffered actual damages to recover the [Unruh Act's] independent statutory damages of $4,000." Molski v. M.J. Cable, Inc., 481 F.3d

724, 731 (9th Cir. 2007). Plaintiffs contend that common questions predominate because they seek only statutory damages under the Unruh Act which are directly attributable to their theory of harm and can be determined without complicated calculations.[9] (Dkt. 66-1, Joint Br. at 46). They add that "should the need arise for class members to confirm eligibility to recover statutory damages under the Unruh Act, it is well-settled that this issue may properly be addressed by way of a claim form after class wide liability has been determined." (Id. at 46-47).

LabCorp contends that individualized issues abound, (Dkt. 66-1, Joint Br. at 48), because "[t]o recover statutory damages under the Unruh Act, a class member must show they 'personally encountered' an Unruh Act violation that caused them difficulty, discomfort, or embarrassment." (Id. at 47). According to LabCorp, "even if Vargas argued that checking in at the front desk caused him difficulty, discomfort, or embarrassment, his own experience cannot be imputed to other California residents who are legally blind[,]" (id. at 47-48), because "not all California PSC's [] have kiosks and for those that do, staffing varies widely[.]" (Id.). LabCorp's contentions are unpersuasive.

LabCorp's argument boils down to determining whether each class member used or was exposed to a kiosk at one of LabCorp's PSCs. But predominance is not concerned with determining who may be entitled to class membership, i.e., identifying legally blind class members who attempted to or were discouraged from using LabCorp's kiosks. Rather, the superiority prong is where that issue is considered. See Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1126 (9th Cir. 2017) (declining to impose a separate administrability requirement to assess the difficulty of identifying class members, in part, because the superiority criterion already mandates considering "the likely difficulties in managing a class action") (internal quotation marks omitted).[10] Here,

---

[9] LabCorp does not challenge predominance under Comcast, 569 U.S. 27, 133 S.Ct. 1426. (See, generally, Dkt. 66-1, Joint Br. at 47-50). Nor could it since plaintiffs are merely seeking statutory damages under the Unruh Act.

[10] To the extent that LabCorp may be arguing that predominance is lacking due to a lack of ascertainability, (see Dkt. 66-1, Joint Br. at 47-50), it is without merit. See Briseno, 844 F.3d at 1133 ("[T]he language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification[.]").

defendant's concern as to whether a particular class member "personally encountered" a check-in kiosk – i.e., identifying those who are entitled to class membership – will not predominate over the more important common questions of fact and law such as whether: (1) "LabCorp's kiosks are independently accessible to legally blind individuals"; (2) "LabCorp has implemented the inaccessible check-in kiosks system across its national network of more than 1,800 PSCs"; (3) "LabCorp trained its employees that use of the kiosks to check-in was mandatory"; (4) "use of the kiosk is a good or service LabCorp offers its customers"; (5) "LabCorp offers a qualified aid or auxiliary service to allow legally blind individuals to access the check-in kiosk service"; and (6) "LabCorp has remedied the inaccessible check-in kiosk across its system." See supra at § I.B.

In addition, although Vargas "need not prove [that] []he suffered actual damages," Molski, 481 F.3d at 731, to prevail on his Unruh disability discrimination claim, LabCorp argues that predominance cannot be established because eligibility for statutory damages cannot "be addressed by way of a claim form after class wide liability has been determined[.]" (See Dkt. 66-1, Joint Br. at 49) (internal quotation marks omitted). In effect, LabCorp argues that predominance cannot be established because the entitlement to statutory damages will have to be done on an individual basis after liability is established. (See id.). However, it is well-settled that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013). In other words, "the fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 989 (9th Cir. 2015) (internal quotation marks omitted); see also Comcast, 569 U.S. at 35, 133 S.Ct. at 1433 (noting that damages "[c]alculations need not be exact" at the class-certification stage). As the Ninth Circuit recently reiterated, "a district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial, a conclusion implicitly based on the determination that such individualized issues do not predominate over common ones." Olean Wholesale Grocery Cooperative, Inc., 31 F.4th at 669. Here, the court can bifurcate the case into a liability and damages phase and, assuming there is a liability determination, create a claims process by which to validate individualized claim

determinations. See, e.g., Briseno, 844 F.3d at 1131 ("Defendant[] will have . . . opportunities to individually challenge the claims of absent class members if and when they file claims for damages. At the claims administration stage, parties have long relied on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to validate claims. Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability.") (citation and internal quotation marks omitted); Mullins v. Direct Digital LLC, 795 F.3d 654, 667 (7th Cir. 2015) (parties regularly rely on "claims administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court" to validate claims); Nevarez v. Forty Niners Football Co., LLC, 326 F.R.D. 562, 577 (N.D. Cal. 2018) ("Class members can certify whether they were present at the Stadium and whether they encountered an actionable Unruh Act violation.") (citing Cal. Civ. Code § 55.56); see also Tyson Foods, 577 U.S. at 461, 136 S.Ct. at 1050 (recognizing that bifurcation could resolve problems regarding uninjured class members); 4 Newberg on Class Actions, § 11:6, at 21 (5th ed. 2014) ("Courts have employed either issue certification (certifying only the question of liability for class treatment) or bifurcation (separating liability from damages and trying liability first, then damages) as the means to effectuate the goal of aggregated treatment.") (footnote omitted).

Further, even assuming it was proper to consider, under the predominance prong, the issue of identifying class members, the court is not persuaded that the "personally encountered" and "difficulty, discomfort, or embarrassment" standard upon which LabCorp relies, (see Dkt. 66-1, Joint Br. at 47), has application to the specific Unruh Act disability discrimination claim in this

action.[11] That standard, which is set forth in California Civil Code § 55.56 [12] of the Construction Related Accessibility Standards Compliance Act ("CRAS"), see Cal. Civ. Code §§ 55.51–55.57, provides in relevant part that statutory damages under § 52(a) may "be recovered in a construction-related accessibility claim against a place of public accommodation only if a violation or violations of one or more construction-related accessibility standards denied the plaintiff full and equal access to the place of public accommodation on a particular occasion. A violation personally encountered by a plaintiff may be sufficient to cause a denial of full and equal access if the plaintiff experienced difficulty, discomfort, or embarrassment because of the violation." Cal. Civ. Code § 55.56(a)-(c) (emphasis added); see Mundy v. Pro-Thro Enterprises, 192 Cal.App.4th Supp. 1, 5 (2011) ("Section 55.56 is part of a comprehensive statutory scheme that was enacted in 2008 with the intent of increasing voluntary compliance with equal access standards while protecting businesses from abusive access litigation. The provisions in [§§] 55.51 through 55.57 apply only to a construction-related accessibility claim, which is defined as a violation of a construction-related accessibility standard under federal or state law[.]") (citations and internal quotation marks omitted); Hernandez v. Polanco Enterprises, Inc., 624 F.Appx. 964, 965 (9th Cir. 2015) ("Under California law, [plaintiff] must prove – in addition to the ADA violation – that she 'personally encountered the violation [of a construction-related accessibility standard] on a particular occasion' and that it caused her 'difficulty, discomfort, or embarrassment,' thus denying her full and equal access to a place of public accommodation.") (quoting Cal. Civ. Code § 55.56(a)-(c)) (first alteration added).

The two cases cited by LabCorp for the proposition that it is necessary for a class member to establish that he or she personally encountered an Unruh Act violation that caused difficulty,

---

[11] With respect to the intent to use LabCorp's services, see White, 7 Cal.5th at 1023, LabCorp does not challenge that requirement. (See, generally, Dkt 66-1, Joint Br. at 47-50). In any event, that requirement would not defeat a finding of predominance. See Quest, 2021 WL 5989958 at *8 (noting that "there is no real question that the putative class members had a bona fide intent to use [defendant's] services" because plaintiff proposed to use defendant's records to identify class members).

[12] Unless otherwise indicated, all section references are to the California Civil Code.

discomfort or embarrassment, (see Dkt. 66-1, Joint Br. at 47), are both construction-related accessibility cases. See Doran v. 7 Eleven, Inc., 2011 WL 13143622, *1 (C.D. Cal. 2011) ("Doran I"), aff'd, 509 F.Appx. 647 (9th Cir. 2013) (noting that plaintiff was a "paraplegic" and that defendant had previously "remov[ed] all barriers related to his disability"); Botosan v. Paul McNally Realty, 216 F.3d 827, 830 (9th Cir. 2000) (plaintiff was a paraplegic asserting claims based on "lack of a designated parking space for disabled persons").[13] Similarly, the three ADA cases LabCorp relies on as examples of where class certification was denied, (see Dkt. 66-1, Joint Br. at 47-49) – Vondersaar v. Starbucks Corp., 2015 WL 629437, *4 (C.D. Cal. 2015), aff'd, 719 F.Appx. 657 (9th Cir. 2018); Moeller v. Taco Bell, 2012 WL 3070863, *14 (N.D. Cal. 2012); Antoninetti v. Chipotle Mexican Grill, Inc., 2012 WL 3762440, *5-*6 & n. 1 (S.D. Cal. 2012) – do not compel the conclusion that predominance is lacking here because, unlike those cases, this case does not involve construction-related accessibility claims. See Quest, 2021 WL 5989958, at *8 (noting that these cases "have certain notable similarities: all three involved disabled plaintiffs who alleged that counter heights and other physical barriers to access in fast food establishments violated the ADA and the Unruh Act").[14] The cases relied upon by LabCorp involved various

[13] Although the court in Quest recognized that § 55.56 "applies specifically to construction-related accessibility claims[,]" 2021 WL 5989958, at *8, it also appeared to accept defendant's argument that "both federal and California courts have [] articulated the same standard without reference to section 55.56." (Id.). LabCorp has not cited, nor has the court found a California published case that has addressed this standard outside of the construction-related accessibility context. On the contrary, the cases suggest otherwise. See, e.g., Mundy, 192 Cal.App.4th Supp. at 5 ("The provisions in [§§] 55.51 through 55.57 apply only to a construction-related accessibility claim, which is defined as a violation of a construction-related accessibility standard under federal or state law[.]") (citations and internal quotation marks omitted); Munson v. Del Taco, Inc., 46 Cal.4th 661, 677-78 (2009) (noting that §§ 55.53-55.57 were enacted to "protect[] businesses from abusive access litigation" arising from construction-related accessibility claims).

[14] These cases are also distinguishable because, as the court in Nevarez observed, Moeller and Antoninetti are procedurally distinct in that the class certification motions were decided "after the defendants' liability had been adjudicated, which meant that the most important common question had already been resolved." Nevarez, 326 F.R.D. at 586 (emphasis omitted). The same holds true with respect to Quest, where the court had already resolved a motion for summary judgment. See Vargas v. Quest Diagnostics Clinical Laboratories, Inc., 2021 WL 5989961, *11 (C.D. Cal. 2021). Here, the court has not yet ruled on a summary judgment motion. Further, unlike the instant case, the kiosks in Quest were not identical because at some point, defendant "began to roll out a change to its kiosks that allow[ed] visually-impaired patients to swipe the

accessibility issues at different restaurants while Vargas's Unruh Act claim is based on LabCorp's kiosks, which are identical. While LabCorp maintains that "[n]ot all California PSC's [sic] even have kiosks[,]" and "for those that do, staffing varies widely depending on location and a PSC's size: some locations have a dedicated patient intake representative ('PIR') who sits full time at the front desk to check in patients; others have phlebotomists to conduct both check in and testing; and some PSCs are located inside Walgreens stores where there is always a dedicated Walgreens staff member to assist patients," (Dkt. 66-1, Joint Br. at 48), the variations are not as significant as LabCorp makes them out to be. First, of the 299 PSCs in California, (Dkt. 82, Exh. 32 (Sinning Depo) at JA1064), only 19 do not have kiosks. (Id.). Second, with respect to PIRs, there is evidence that LabCorp has "very few PIRs" and instead, "[t]he vast majority of the people working in [the PSCs] doing patient care and intake are phlebotomists." (Id. at JA1067-68). In other words, LabCorp is aware of which PSCs in California have kiosks, when they were installed and made operational, and how each PSC is staffed.

Finally, even if the standard set forth in § 55.56 applied in this case, it would not defeat a finding of predominance. In Nevarez, the plaintiffs, who required the use of wheelchairs, 326 F.R.D. at 569, sued several defendants, including the owners and operators of Levi's Stadium, asserting claims under the ADA and the Unruh Act. See id. at 568-71. The plaintiffs alleged that they faced barriers in accessing the stadium, including a lack of accessible seating, narrow security checkpoints, heavy doors, and inaccessible counters. See id. at 569-70, 578. The plaintiffs sought to certify a Rule 23(b)(3) class of persons who use wheelchairs, scooters or other mobility aids who "purchased, attempted to purchase, or for whom third parties purchased accessible seating," and who were denied equal access to the stadium. Id. at 572. The plaintiffs sought "statutory minimum damages of $4,000 per actionable violation of the Unruh Act[.]" Id. at 571.

With respect to the predominance requirement, the defendants made the same argument LabCorp makes here – namely that "individual questions predominate because each class

---

touchscreen using three fingers, which checks the patient in and alerts a phlebotomist that the patient has arrived." Quest, 2021 WL 5989958, at *1.

member will have to prove that they 'personally encountered' an Unruh Act violation that caused 'difficulty, discomfort, or embarrassment' to the class member." Nevarez, 326 F.R.D. at 585 (quoting Cal. Civ. Code §§ 55.56(b)-(c)). Then-district Judge Koh rejected the defendants' contention that application of § 55.56 defeated predominance, noting that defendants kept "records of class members' purchases of accessible seating that include[d] names and contact information." Id. at 586. Similar to Nevarez and, as discussed below, see infra at § II.B.2., there should be minimal logistical difficulties to identifying class members given the uniformity of the kiosks, and the fact that LabCorp "knows how many patients checked in, and has information on those patients from their provided ID and insurance[.]" (Dkt. 66-1, Joint Br. at 21 n. 4).

In short, the court finds that plaintiff has established that common questions of fact and law predominate over individualized questions.

**2. Superiority.**

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." Wolin, 617 F.3d at 1175 (internal quotation marks omitted). To determine superiority, the court must look at

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Of the four superiority factors, LabCorp appears to dispute only the fourth factor regarding whether the case is manageable as a class action.[15] (See Dkt. 66-1, Joint Br. at 51-53). First,

---

[15] Given the substantial overlap between LabCorp's predominance argument, which appears to primarily challenge the feasibility of maintaining a Rule 23(b)(3) class, the court hereby incorporates the predominance discussion set forth above. See supra at § II.B.1.

LabCorp relies on "[t]wo of the decisions[, Antoninetti and Moeller,] already discussed in Labcorp's predominance section" to argue that "class procedures" are "not superior for adjudicating" plaintiffs' Unruh Act claim, "considering the individualized issues involved in assessing damages and the hefty per-claimant minimum statutory damages amounts incentivizing lawsuits." (Id. at 51). LabCorp's argument and the cases it relies on were addressed and rejected in the previous section. See supra at § II.B.1. Further, it should be noted that LabCorp provides no explanation or authority as to why the statutory minimum damages amount under the Unruh Act qualifies as "hefty" and, even assuming it did qualify as a "hefty" damages amount, LabCorp does not explain why that matters in terms of assessing whether a class action is manageable. (See, generally, Dkt. 66-1, Joint Br. at 51). In any event, the $4,000 statutory damages amount is a minimal sum that "would be dwarfed by the cost of litigating on an individual basis[.]" Wolin, 617 F.3d at 1175; see Local Joint Exec. Bd. of Culinary/Bartender Trust Fund, 244 F.3d at 1163 (stating that "[i]f plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover"). In other words, the superiority requirement strongly "weighs in favor of class certification." Wolin, 617 F.3d at 1175 (discussing Rule 23(b)(3)(A) superiority factor). As the Nevarez court stated, "[a]lthough class members are entitled to $4,000 in damages per Unruh Act violation that sum pales in comparison with the cost of pursuing litigation. Consequently, this factor points towards certification." 326 F.R.D. at 589; see Local Joint Exec. Bd. of Culinary/Bartender Trust Fund, 244 F.3d at 1163 (In cases where a number of individuals seek only to recover relatively small sums, "[c]lass actions may permit the plaintiffs to pool claims which would be uneconomical to bring individually.").

Second, with respect to LabCorp's contention that the class would not be manageable given that plaintiffs "have not indicated how they would locate [] class members[,]" (Dkt. 66-1, Joint Br. at 51-52), it is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." Briseno, 844 F.3d at 1128 (internal quotation marks omitted); Nevarez, 326 F.R.D. at 590 (same). Moreover, "[t]here is no requirement that the identity of class members . . . be known at the time of certification." Ries v. Ariz. Beverages USA LLC,

287 F.R.D. 523, 535 (N.D. Cal. 2016); see id. ("If there were [an identification requirement], there would be no such thing as a consumer class action."). In any event, identifying class members here would not be difficult. LabCorp "knows how many patients checked in, and has information on those patients from their provided ID and insurance[.]" (Dkt. 66-1, Joint Br. at 21 n. 4). While it may not know at this point "which persons would fall into the category of legally blind[,]" (id.), making that determination at a later stage of the proceedings would not be an unduly burdensome task. Indeed, LabCorp was able to determine that Davis was mistaken with respect to the dates of one of his visits to a LabCorp PSC. (See Dkt. 266-1, Joint Br. at 23); (Dkt. 79, Exh. 14 (Davis Depo) at JA268-69). Certainly a similar undertaking could be done at the appropriate juncture.

Based on the foregoing, IT IS ORDERED THAT:

1. The Motion **(Document No. 66)** is **granted** as set forth in this Order. The court certifies the following classes:

Nationwide Injunctive Class: All legally blind individuals in the United States who visited a LabCorp patient service center in the United States during the applicable limitations period and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals.

California Class: All legally blind individuals in California who visited a LabCorp patient service center in California during the applicable limitations period and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals.[16]

---

[16] Since the class definitions discussed by the parties did not address the temporal scope of the two classes, the court added the language "during the applicable limitations period" to the definition. See Torres v. Mercer Canyons, Inc., 835 F.3d 1125, 1139 (9th Cir. 2016) (acknowledging that "the district court may . . . adjust the scope of the class definition, if it later finds that the inclusiveness of the class exceeds the limits of [the defendant'] legal liability").

2. The court hereby appoints Luke Davis and Julian Vargas as the representatives of the Nationwide Class and Vargas as the representative of the California Class.

3. The court hereby appoints the law firms of Nye, Stirling, Hale & Miller, LLP and Handley, Farah & Anderson, PLLC as class counsel.

Dated this 23rd day of May, 2022.

/s/
Fernando M. Olguin
United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 1 of 15 |

Present: The Honorable DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| KANE TIEN | NOT REPORTED |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [107]**

This matter is before the Court on Plaintiff Julian Vargas's Motion for Class Certification (the "Motion"). [Doc. # 107.] The Motion is fully briefed. [*See* Doc. ## 133, 147.] The Court held a hearing on the Motion on October 29, 2021. For the reasons set forth below, Vargas's Motion is **GRANTED in part** and **DENIED in part**.

## I.
## BACKGROUND

The Court described the factual and procedural background of this case at length in its Order denying Defendant Quest Diagnostics' Motion for Summary Judgment. [*See* Doc. # 144.] For purposes of the instant Motion for Class Certification, the relevant facts are as follows.

Quest provides diagnostic services at patient service centers around the country. Beginning in the spring of 2016, Quest began to install touchscreen electronic kiosks at its patient service centers to enable patients to check in for their appointments. Quest concedes that these kiosks, as originally rolled out, were inaccessible to legally blind patients. Instead, Quest asserts that—consistent with Quest's preexisting practice of using paper sign-in sheets—patients who could not or did not wish to check in using a kiosk could check in with a Quest phlebotomist. Quest phlebotomists, however, are primarily responsible for collecting patient specimens, not staffing the waiting room, so phlebotomists may only be available when they emerge from the back of a patient service center, which may or may not happen frequently enough to allow phlebotomists to attend to newly-arrived patients. Beginning in 2020, Quest began to roll out a change to its kiosks that allows visually-impaired patients to swipe the touchscreen using three fingers, which checks the patient in and alerts a phlebotomist that the patient has arrived.

Plaintiffs Julian Vargas, Anne West,[1] and the American Council for the Blind filed the operative First Amended Complaint ("FAC") in this Court on May 15, 2020. [Doc. # 41.] The FAC asserts claims for violations of (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. section 12101 *et seq.*, (2) California's Unruh Civil Rights Act, Cal. Civ. Code section 51 *et seq.*, (3) California's Disabled Persons Act, Cal. Civ. Code sections 54-54.3, and (4) section 504 of the Rehabilitation Act, 29 U.S.C. section 794. On October 15, 2021, the Court granted summary judgment in favor of Quest as to Plaintiffs' claim under the Rehabilitation Act and as to Plaintiffs' claims under the Unruh Act and the Disabled Persons Act to the extent Plaintiffs asserted claims under those statutes separate from their ADA claims. [*See* Doc. # 144.]

Pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Vargas seeks to certify the following class:

> All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018, through December 31, 2019 (the "Class Period"), and were denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals.

Not. of Mot. for Class Certification ("Not.") at 2. [Doc. # 107.] Vargas also seeks to certify the following California sub-class:

> All legally blind individuals who visited a Quest patient service center in California during the Class Period and were denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals.

*Id.* Vargas asserts his ADA claim on behalf of the proposed nationwide class, and the Unruh Act and Disabled Persons Act claims only on behalf of the proposed California sub-class. Vargas also seeks appointment as class representative for both the nationwide class and the California sub-class, and for appointment of the law firms Nye, Stirling, Hale and Miller, LLP and Handley, Farah & Anderson, PLLC as class counsel. Not. at 2.

[1] On May 27, 2021, West voluntarily dismissed all her claims with prejudice. [Doc. # 78.]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 3 of 15 |

## II.
## REQUEST FOR JUDICIAL NOTICE

Quest requests that the Court take judicial notice of two documents published online. [Doc. # 135.] First, Quest seeks judicial notice of a report by the law firm Seyfarth Shaw counting claims brought under Title III of the ADA in various courts across different years. Second, Quest seeks judicial notice of a list of definitions published by the American Federation of the Blind. Because the Court does not rely on the documents for which Quest requests judicial notice, the Court **DENIES** Quest's request as moot.

## III.
## LEGAL STANDARD

Federal Rule of Civil Procedure 23 provides the standard for certification of a class action. Vargas must meet all of the requirements under Rule 23(a) and must also satisfy at least one of Rule 23(b)'s requirements.

Courts refer to the Rule 23(a) requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation." *See Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). The Ninth Circuit does not recognize an "ascertainability" requirement under Rule 23. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) ("[Defendant] cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement. This is not surprising because we have not.").

If the four prerequisites of Rule 23(a) are satisfied, the Court also must find that Vargas can "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Vargas seeks class certification pursuant to Rule 23(b)(2) and Rule 23(b)(3). Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 is more than a pleading standard, and it requires the party seeking class certification to "affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc.*

*v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation omitted). Thus, a court must conduct a "rigorous" class certification analysis. *Id.* at 350-51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). Frequently, the analysis "will entail some overlap with the merits of the plaintiff's underlying claim," and "sometimes it may be necessary for the court to probe behind the pleadings . . . ." *Id.* at 351 (internal quotation omitted). The Supreme Court cautions, however, that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

## IV.
## DISCUSSION

### A. Class Definition

Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" in places of public accommodation. 42 U.S.C. § 12182(a). Discrimination includes a public accommodation's failure to take steps necessary to "ensure" that disabled individuals are not "excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Id.* at § 12182(b)(2)(A)(iii). Regulations promulgated by the Department of Justice further provide that a public accommodation must provide appropriate auxiliary aids and services necessary "to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

Title III "prohibits anything less than the full and equal enjoyment of places of public accommodation by individuals with disabilities." *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101 (9th Cir. 2021). "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

Vargas draws his proposed class narrowly: all legally blind individuals who visited a Quest patient service center and were denied full and equal access *because of Quest's failure to make its e-check-in self-service kiosks independently accessible*. Vargas's framing assumes the ADA requires that Quest's kiosks be "independently accessible." Quest, on the other hand, argues that during the class period it ensured effective communication with its blind patients

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL



because phlebotomists were available to assist blind patients, who Quest admits could not use the kiosks independently.

In its MSJ Order, the Court did not reach the question of whether the kiosks must be independently accessible, because Plaintiffs offered evidence that established a triable issue of fact as to whether phlebotomists were in fact available to assist blind patients. *See* MSJ Ord. at 13. ADA regulations are clear that a public accommodation may choose which auxiliary aids to provide in order to ensure effective communication, so long as the method chosen "results in effective communication." *See* 28 C.F.R. § 36.303(c)(1)(ii).

Vargas has defined the proposed class based on his theory of Quest's liability. This appears to be a so-called "fail-safe" class. *See Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017) ("*Melgar II*") ("A fail-safe class is commonly defined as limiting membership to plaintiffs described by their theory of liability in the class definition such that the definition presupposes success on the merits.") (citing William B. Rubenstein, 1 Newberg on Class Actions § 3:6 (5th ed.)).

In *Melgar II*, the Ninth Circuit "note[d], though [. . .did] not hold, that our circuit's caselaw appears to disapprove of the premise that a class can be fail-safe." 681 F. App'x at 607; *see also Vizcaino v. U.S. District Court for Western Dist. Of Washington*, 173 F.3d 713, 722 (9th Cir. 1999). District courts in this circuit have certified similar classes in the disability litigation context. *See Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 575 (N.D. Cal. 2018) (certifying three classes of "[. . .] persons with mobility disabilities who use wheelchairs, scooters, or other mobility aids who will attempt to purchase accessible seating for a public event [. . .] and who will be denied equal access to [a stadium's] facilities, services, accessible seating, parking, amenities, and privileges, including ticketing" and collecting cases). And Vargas's narrow class definition may ultimately benefit Quest: Vargas's class is so narrow that Plaintiffs must prevail on a specific theory of Quest's liability in order for the class to prevail against Quest. If Plaintiffs' legal theory fails or they prevail on a different theory, Quest will be potentially liable only to the individual plaintiff.

### B. Rule 23(a) Requirements

#### 1. Numerosity

A putative class may be certified only if it "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 6 of 15 |

*Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (quoting *Adver. Specialty Nat'l Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir. 1956)). The numerosity requirement imposes no absolute limitations; rather, it "requires examination of the specific facts of each case." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330 (1980). Thus, while the Supreme Court has noted that putative classes of 15 are too small to meet the numerosity requirement, *id.* at 330 & n.14, district courts in this Circuit have found that classes with as few as 39 members met the numerosity requirement, *see Patrick v. Marshall*, 460 F. Supp. 23, 26 (N.D. Cal. 1978); *see also Jordan v. L.A. County*, 669 F.2d 1311, 1320 (9th Cir. 1982) (noting, in *dicta*, that the court "would be inclined to find the numerosity requirement . . . satisfied solely on the basis of [39] ascertained class members"), *vacated on other grounds*, 459 U.S. 810 (1982).

Vargas offers a declaration estimating the number of legally blind patients who may have checked into a Quest Patient Service Center in a given year, based on the average number of annual check-ins, the average number of visits per year by any given patient, and the percentage of legally blind individuals in the population as a whole. *See* Green Decl. at ¶¶ 21-23 [Doc. # 107-5, Ex. 33]. Vargas's expert, Jed Greene, estimates that between 6,152 and 8,472 legally blind individuals must have visited a Quest Patient Service Center in California, and between 31,863 and 45,500 nationwide. *Id.* at Table 3. Quest calls Green's estimate a "guesstimate," but even if Green's estimate is off by a large margin, there are clearly enough legally blind visitors to Quest patient service centers in any given year to render it impracticable to join them all in this case.

Vargas does not seek to certify a class of all legally blind patients who visited Quest patient service centers, however. Vargas seeks to certify a class of all legally blind patients who visited Quest patient service centers and were denied equal access to Quest's services because of the absence of effective communication through independently accessible self-service kiosks. Nevertheless, based on complaints received by Quest and by the American Council for the Blind, there appear to be a sufficiently sizeable number of visually-impaired individuals across Quest's network who identified access issues.[2]

Vargas counts up the feedback received by the American Council for the Blind (29) and Quest itself (45) regarding visually impaired individuals' use of the kiosks. Adding himself, he concludes that the proposed class consists of at least 75 class members. Mot. at 19-20. Quest argues that the feedback items it received were not all complaints regarding this particular issue, that some of the feedback indicates patients were promptly helped by phlebotomists, and that the

[2] The parties do not address how many of the visually-impaired individuals who identified access issues visited patient service centers in California. Because the Court declines to certify a California sub-class, however, the Court need not address whether there are enough patients who identified access issues in California.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 7 of 15 |

feedback Vargas offers as evidence does not take into account the Three-Finger Swipe, which Quest argues moots Vargas's claims.[3] Opp. at 10.

Quest is correct that not all feedback regarding the kiosks clearly reflects the unavailability of phlebotomist assistance for patients who could not use the kiosks. At least eight of the complaints received by Quest describe exactly this problem, however. [*See* Doc. # 94-3.] Likewise, at least eight ACB members described the same problem. [*See* Doc. # 107-5, Ex. 24.] Moreover, a number of other Quest feedback items indicate that visually-impaired patients asked other patients for help or otherwise were unable to use the kiosks in a way that clearly satisfies the ADA. Because not every patient will lodge a complaint (and, as Vargas points out, Quest's system for lodging complaints may also be inaccessible), it is highly unlikely that these complaints reflect every individual who encountered these problems. *Shields v. Walt Disney Parks & Resorts US, Inc.*, 279 F.R.D. 529, 545 (C.D. Cal. 2011). Vargas has therefore demonstrated that there are a sufficient number of potential class members during the class period to satisfy the numerosity requirement.

**2. Commonality**

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). In determining that a common question of law exists, it is insufficient to find that all putative class members have suffered a violation of the same provision of law. *Id.* Rather, the putative class members' claims "must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Vargas has defined his proposed class in terms of the injury they have suffered. It is therefore virtually a foregone conclusion that the class members will share common questions or law or fact. Vargas identifies the following common questions of law or fact: (1) whether

[3] Quest also objects that the customer feedback items are hearsay. Opp. at 11. The Ninth Circuit does not require that evidence submitted in connection with a class certification motion be admissible. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1651 (2019) ("Inadmissibility alone is not a proper basis to reject evidence submitted in support of class certification."). Since the Court's "consideration should not be limited to only admissible evidence" at the class certification stage, the Court need not decide whether any hearsay objections apply to the customer feedback. Quest's objections are **OVERRULED** to the extent they seek to exclude evidence solely under evidentiary rules governing admissibility.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 8 of 15 |

Quest's ECSS kiosks are independently accessible to legally blind individuals; (2) whether Quest has implemented the inaccessible ECSS kiosks across its national network of 2,152 PSCs; (3) whether use of the kiosk is a service Quest offers its customers; (4) whether Quest offers a qualified aid or auxiliary service to allow legally blind individuals to access the ECSS kiosk; and (5) whether Quest has remedied the inaccessible ECSS kiosk across its system. Mot. at 21.

There is no real question that the kiosks, as implemented during the class period, were not independently accessible to blind customers. Likewise, there is no real dispute that Quest had not implemented its kiosks across its network at the beginning of the class period. And the Court has already determined that the use of the kiosks is part of the service Quest offers its customers. MSJ Ord. at 10. Posed slightly differently, however, Vargas's final two questions are common questions central to the validity of each proposed class-member's claim.[4] Whether Quest during the class period offered an auxiliary aid or service that allows blind patients to access the services provided through the kiosks, and whether the three-finger swipe has remedied any access violations created by the kiosks, are questions common to the class members that remain outstanding.

Vargas has satisfied the commonality requirement.

**3. Typicality**

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* Typicality is a "permissive standard" and requires only that the representative's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

[4] Quest notes that the *answer* to these questions may, in some cases, require individualized treatment. The Court will address this concern *infra*. Quest also points out that the "primary consideration" requirement imposed on Quest by the Rehabilitation Act and the Affordable Care Act is ill-suited to class consideration. The Court shares Quest's concern, *see* MSJ Ord. at 18 n.11, but previously granted Quest's MSJ as to this claim, so need not address the issue here.

Case: 21-56380, 12/17/2021, ID: 12319500, DktEntry: 1-2, Page 65 of 141

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 9 of 15 |

There is no real dispute that, to the extent there are common questions shared by the class members, Vargas's experience with Quest's kiosks raises the same questions. Vargas, like other putative class members who filed complaints with Quest and with the American Council for the Blind, encountered an inaccessible kiosk and was not offered an auxiliary aid or service—even assistance from a Quest phlebotomist—to allow him equal access to Quest's services. Vargas has satisfied the typicality requirement.

**4. Adequacy of Representation**

The Rule 23(a)(4) adequacy determination turns on the answers to two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Similarly, Rule 23(g) requires courts to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P 23(g)(1)(A).

The Court is not aware of, and Quest does not raise, any conflicts between Vargas's counsel and the proposed class. Likewise, Quest does not dispute that Vargas's counsel will prosecute the action vigorously on behalf of the class.

Quest argues that Vargas's decision to seek damages under California law on behalf of a California sub-class in addition to injunctive relief on behalf of a nationwide class creates a conflict between Vargas and the class. According to Quest, a decision to seek *only* damages or *only* injunctive relief may render a class representative's representation inadequate under certain circumstances. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985-86 (9th Cir. 2011) (noting that plaintiffs who lack standing to seek injunctive relief cannot adequately protect the interests of class members whose primary goal is to seek injunctive relief). Although the Court declines to certify a damages sub-class, Vargas may continue to seek both injunctive relief on behalf of the class and damages on his own behalf. Vargas and his counsel satisfy the adequacy requirement.

**C. Rule 23(b)(2) Requirements**

Classes may be certified pursuant to Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 10 of 15 |

or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Class certification under Rule 23(b)(2) is possible only when declaratory or injunctive relief is sought. Rule 23(b)(2) certification is available for monetary relief, if at all, only when such relief is incidental to the injunctive or declaratory relief. *Dukes*, 564 at 360. Civil rights actions against parties charged with unlawful, class-based discrimination are "prime examples" of Rule 23(b)(2) cases. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *see also Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (explaining that Rule 23(b)(2) "was adopted in order to permit the prosecution of civil rights actions").

In determining whether certification is appropriate under Rule 23(b)(2), a court must "look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). "The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Id.* (citing *Walters*, 145 F.3d at 1047). Claims for individualized relief, in contrast, do not satisfy Rule 23(b)(2). This subsection "applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360-61.

This is a civil rights action against a party charged with unlawful, class-based discrimination based on the use of a specific auxiliary aid or service, and is a prime candidate for 23(b)(2) certification. The only real questions are whether the three-finger swipe has resolved Plaintiffs' claims such that the ADA claim for injunctive relief will become moot and whether the kiosks must be independently accessible. The Court found in its MSJ Order that Plaintiffs' ADA claim is not moot because disputed issues of fact exist. MSJ Ord. at 20-21. Vargas's proposed nationwide class is therefore suitable for 23(b)(2) certification.

**D. Rule 23(b)(3) Requirements**

To satisfy Rule 23(b)(3), a plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Because the Court has found the nationwide class is suitable for 23(b)(2) certification, this section addresses only Vargas's proposed California sub-class.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 11 of 15 |

**1. Predominance**

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal citations and quotations omitted). This requires "careful scrutiny" of "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal citations and quotations omitted). If "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*

Vargas argues that the questions common to class members predominate over individual issues because each class member encountered the inaccessible kiosk in exactly the same way: it was not independently accessible, and therefore class members were all harmed by it in the same way. Quest correctly points out that this argument hangs on Plaintiffs' argument that the ADA requires independently accessible kiosks. Quest, on the other hand, argues that because phlebotomist assistance is an acceptable auxiliary aid, and because some class members would not want to use independently accessible kiosks even if they were available, individualized issues predominate over common ones.

The Court observed at summary judgment that the kiosks were designed in part to allow phlebotomists to be unavailable. *See* MSJ Ord. at 13. The Court also found at summary judgment that there remained a question whether Plaintiffs' evidence established inaccessibility across Quest's entire network. *See id.* at 13 n.9. Finally, the Court found that disputed factual issues remain as to whether the three-finger swipe had remedied any ADA violations created by the kiosks. *Id.* at 20-21. Vargas has defined the proposed class narrowly, and the class claim will turn on whether Vargas can establish that the ADA requires independently accessible kiosks. With this framing in mind, the questions of whether Quest provided an auxiliary aid or service that ensured effective communication with blind individuals during the class period, and whether the three-finger swipe has resolved that issue, predominate over individualized issues as to effective communication.

Quest also argues that, because the Unruh Act requires that a plaintiff prove he personally encountered a violation and experienced "difficulty, discomfort, or embarrassment because of the violation," *see* Cal. Civ. Code § 55.56(b)-(c), individualized issues predominate over common ones with respect to that class such that Vargas cannot maintain a class action under the Unruh Act.

Case: 21-80053, 12/28/2022, ID: 12619650, DktEntry: 11, Page 68 of 141

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 12 of 15 |

This section of the Unruh Act applies specifically to construction-related accessibility claims. *See* § 55.56(a); *Mundy v. Pro-Thro Enterprises*, 192 Cal. App. 4th Supp. 1, 5 (2011) ("The provisions in sections 55.51 through 55.57 apply only to a 'construction-related accessibility claim' [. . . .]"); *see also Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 677-78 (2009) (noting section 55.56 was enacted to protect businesses from abusive access litigation specifically with respect to construction-related access barriers). At the hearing on this matter, Quest argued that both federal and California courts have nevertheless articulated the same standard without reference to section 55.56.

Under California law, "[i]n general, a person suffers discrimination under the [Unruh] Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services." *White v. Square, Inc.*, 7 Cal. 5th 1019, 1023 (2019). A plaintiff will lack standing under the Act if he lacked intent to use a business's services. *See Thurston v. Omni Hotels Mgmt. Corp.*, 284 Cal. Rptr. 3d 341, 348 (Cal. App. 2021) (affirming requirement that an Unruh Act plaintiff have a "bona fide" intent to use defendant's services); *Reycraft v. Lee*, 177 Cal. App. 4th 1211, 1224 (2009) (finding standing to seek damages under the Disabled Persons Act requires a showing that a disabled plaintiff "actually presented himself or herself to a business or public place with the intent of purchasing its products or utilizing its services in the manner in which those products and/or services are typically offered to the public and was actually denied equal access on a particular occasion"); *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1177 (9th Cir. 2010) (affirming denial of statutory damages under the Disabled Persons Act for visits to Chipotle during which plaintiff was not actually seeking to purchase food or to have the "Chipotle experience").

Because Vargas proposes to identify members of the California sub-class using Quest's own records of patients who actually used Quest's services, there is no real question that the putative class members had a bona fide intent to use Quest's services. The issue of whether a putative class member actually presented himself or herself at a particular Quest location and encountered a barrier to access, however, poses a more difficult problem.

Quest cites three cases in which district courts in California have declined to certify Unruh Act classes because individualized issues predominated over common ones. The three cases cited by Quest have certain notable similarities: all three involved disabled plaintiffs who alleged that counter heights and other physical barriers to access in fast food establishments violated the ADA and the Unruh Act. For example, in *Vondersaar v. Starbucks Corp.*, the court denied certification of nationwide and California classes of disabled wheelchair and scooter users who had been adversely affected by high handoff counters in Starbucks stores constructed during

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|
| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 13 of 15 |

a particular period. No. CV 12-05027-DDP (AJWx), 2015 WL 629437, at *1, 4 (C.D. Cal. Feb. 12, 2015), *aff'd*, 719 F. App'x 657 (9th Cir. 2018). In *Moeller v. Taco Bell Corp.*, the court decertified an Unruh Act class because individualized issues, such as which Taco Bell store a class member visited and what barriers he or she encountered, would predominate over common ones. No. CV 02-5849-PJH, 2012 WL 3070863, at *6 (N.D. Cal. July 26, 2012). In *Antoninetti*, the court denied certification of an Unruh Act class because the question of whether each putative class member actually encountered a barrier to access and was denied equal access on a particular occasion would require a fact-intensive inquiry regarding counter heights and whether a class member sat high enough in his or her wheelchair to actually see over the counter on a given visit to a particular Chipotle store. No. CV 06-2671-BTM (WMc), 2012 WL 3762440, at *6 (S.D. Cal. Aug. 28, 20212).

District courts in California have, however, certified Unruh Act classes even applying the pleading standard imposed by section 55.56. In *Nevarez v. Forty Niners Football Company, LLC*, 326 F.R.D. 562 (N.D. Cal. 2018), the court certified a damages class of individuals with mobility disabilities who "ha[d] purchased, attempted to purchase, or for whom third parties [had] purchased accessible seating" at a football stadium and "who ha[d] been denied equal access" to the stadium's facilities and services. *Id*. at 586. In its predominance analysis, the court distinguished the cases cited by Quest above. The court emphasized that although the football stadium was large, it was still only one building. *Id*. The court also found "perhaps most important" the fact that the defendants kept records of class members' purchase of accessible seating, including the purchasers' names and contact information. *Id*.

This case sits somewhere between *Nevarez* and the fast food cases cited by Quest. Unlike in the fast food cases, the record here is uncontroverted that Quest's kiosks were identical—and similarly inaccessible—across Quest's network of patient service centers. There are therefore fewer individualized issues regarding what barriers to access a putative class member encountered. Moreover, as the Court has noted elsewhere, individualized issues regarding whether a phlebotomist offered the class member assistance do not predominate because of the narrowness of the proposed class definition, and more importantly because the Court has already found that the kiosks were designed in part to allow phlebotomists to be unavailable.

The critical facts that allowed for class certification in *Nevarez*, however, are not present here. Unlike in *Nevarez*, this case does not involve one big building; it involves hundreds of small ones. *See* Green Decl., Ex. L (showing 77 patient service centers in Los Angeles County alone) [Doc. # 107-5]. Issues such as whether a patient service center had a fully operative kiosk on the date of a putative class member's visit will therefore require individualized inquiries.

Most importantly, although Quest maintains records of the patients who visit its patient service centers, Quest does not keep records regarding its patients' visual impairments. A patient's use of the three-finger swipe to check in for an appointment might serve as a useful proxy for determining whether a patient was visually impaired, but the three-finger swipe was not implemented until after the end of the class period and some patients may have had access to an auxiliary aid or service that ensured effective communication. Moreover, the kiosks were not rolled out uniformly across Quest's network throughout the class period.

Under Vargas's theory of the case each putative class member must show only (1) that he or she is legally blind and (2) that he or she visited a patient service center *with* a kiosk and *without* a staffed desk (3) during the class period. Under these circumstances, however, demonstrating these basic factual elements will still essentially require each putative class member to litigate her own individual Unruh Act case. Vargas's expert estimates that, at a minimum, nearly three million patients attempted to use a Quest kiosk each year of the class period. Green Decl. at ¶ 22; *id.* at Ex. E. Vargas's expert likewise estimates that fewer than .5% of these patients are putative class members. Without at least a proxy for determining class membership to narrow the scope of the individualized inquiry, the Court comes to the ineluctable conclusion that individualized issues will predominate over common ones with respect to the California sub-class.

**2. Superiority**

The factors the Court considers in determining superiority of the class action device are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). When "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001).

The prime issue under the superiority analysis is whether each class member should be required to litigate his or her own case. There is no indication that individual class members (other than Vargas) have filed individual claims seeking to adjudicate their own cases.

Concentrating litigation in this forum is not particularly desirable, nor is it particularly undesirable—so this factor is neutral. As discussed *supra*, however, it is clear that given the circumstances, each class member would essentially need to litigate her own case even if the Unruh Act sub-class were certified. These individualized issues render a California sub-class unmanageable.

Moreover, the Unruh Act provides for $4,000 in minimum statutory damages for each violation. Although $4,000 is not such a large bounty that it is likely to drive all 6,000 potential California sub-class members to court, the statutory damages plus attorneys' fees available for prevailing plaintiffs renders individual actions a viable alternative to a class action. *See Antoninetti*, 2012 WL 3762440, at *7 (noting the Unruh Act's minimum statutory damages plus attorneys' fees provides individuals with a "significant monetary incentive to file individual lawsuits").

Under these circumstances, a class action is not superior to other available methods for adjudicating the Unruh Act claim. Vargas's motion to certify a damages sub-class is therefore **DENIED**.

## V.
## CONCLUSION

In light of the foregoing, Vargas's Motion for Class Certification is **GRANTED in part** and **DENIED in part**. The Court certifies the following class:

> All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018 through December 31, 2019 (the "Class Period"), and were denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals.

The Court certifies Vargas as class representative, and appoints the law firms Nye, Stirling, Hale and Miller, LLP and Handley, Farah & Anderson, PLLC as co-class counsel.

**IT IS SO ORDERED.**

# EXHIBIT C

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JULIAN VARGAS, ANNE WEST and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. CV 19-8108-DMG (MRWx)<br><br>**ORDER GRANTING DEFENDANTS' *EX PARTE* APPLICATION FOR LEAVE TO FILE A MOTION FOR PARTIAL SUMMARY JUDGMENT [209]** |

The *Ex Parte* Application ("EPA") [Doc. # 209] of defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated (collectively, "Quest" or "Defendants"), came under the Court's consideration along with the papers supporting and opposing the Application, and other documents in the Court's file in this action.

Quest seeks leave to file a second motion for summary judgment ("MSJ"), and therefore seeks relief from this Court's standing order, which limits each side to a single MSJ. *See* Initial Standing Order at 6 [Doc. # 13]. Because the EPA was filed on May 6, 2022, the dispositive motion deadline, Quest likewise seeks relief from this Court's scheduling order, and asks the Court to deem its MSJ timely filed.

Quest seeks leave to file a second MSJ in order to brief the issue of whether the ADA requires Quest's kiosks to be "independently accessible." Because the Court concludes this briefing would be useful in narrowing the issues for trial, the Court GRANTS Quest's EPA and deems the MSJ attached to Quest's EPA timely filed. Quest shall file the MSJ on the docket within two (2) court days of this Order. The Court will hold a hearing on the cross-MSJs on June 17, 2022 at 2:00 p.m.

The Court also notes that the Ninth Circuit recently stated in an *en banc* decision that district courts should not define classes to include only those who were injured by allegedly unlawful conduct. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022). In their briefing on Quest's MSJ, the parties shall address whether the Court should decertify or redefine the class in light of the *Olean* decision and this Court's decision to certify only a Rule 23(b)(2) class.

IT IS SO ORDERED.

DATED: May 11, 2022

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS; and DOES 1 through 10,<br><br>Defendants. | Case No. 2:20-CV-00893-FMO-KS |

DEPOSITION OF JULIAN VARGAS

TAKEN REMOTELY VIA ZOOM VIDEO CONFERENCE

WEDNESDAY, FEBRUARY 10, 2021

REPORTED BY: JANET MURPHY, CSR 9650
JOB NO.: 210210JM

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS; and DOES 1 through 10,

Defendants.

Case No. 2:20-CV-00893-FMO-KS

DEPOSITION OF JULIAN VARGAS, taken remotely via Zoom Video Conference, commencing at 11:01 a.m. Pacific Standard Time on Wednesday, February 10, 2021, reported by Janet Murphy, CSR 9650, business address 3510 Torrance Boulevard, Suite 102, Torrance, California 90503.

APPEARANCES OF COUNSEL:

ATTORNEYS FOR PLAINTIFFS
LUKE DAVIS, JULIAN VARGAS, AMERICAN
COUNCIL OF THE BLIND, AND THE CLASS:

NYE, STIRLING, HALE & MILLER, LLP
BY: BENJAMIN J. SWEET, ESQ.
CALLUM APPLEBY, ESQ.
1145 Bower Hill Road
Suite 104
Pittsburgh, Pennsylvania 15243
(412) 857-5350 / FAX (805) 284-9590
E-MAIL: ben@nshmlaw.com
callum@nshmlaw.com

NYE, STIRLING, HALE & MILLER, LLP
BY: JONATHAN D. MILLER, ESQ.
33 West Mission Street
Suite 201
Santa Barbara, California 93101
(805) 963-2345 / FAX (805) 284-9590
E-MAIL: jonathan@nshmlaw.com

HANDLEY FARAH & ANDERSON PLLC
BY: MATTHEW K. HANDLEY, ESQ.
777 6th Street NW
11th Floor
Washington, DC 20001
(202) 559-2411 / FAX (844) 300-1952
E-MAIL: mhandley@hfajustice.com

ATTORNEYS FOR DEFENDANT
LABORATORY CORPORATION OF AMERICA HOLDINGS:

KELLEY DRYE & WARREN LLP
BY: ROBERT I. STEINER, ESQ.
JEWEL K. TEWIAH, ESQ.
101 Park Avenue
New York, New York 10178
(212) 808-7800 / FAX (212) 808-7897
E-MAIL: rsteiner@kelleydrye.com
jtewiah@kelleydrye.com

I N D E X

| DEPONENT | EXAMINED BY: | PAGE: |
|---|---|---|
| JULIAN VARGAS | MR. STEINER | 5, 74 |
| | MR. SWEET | 67 |

EXHIBITS MARKED FOR IDENTIFICATION:

(NONE)

QUESTIONS UNANSWERED BY DEPONENT:

(MARKED WITH ^ IN TRANSCRIPT)

| PAGE | LINE |
|---|---|
| 18 | 18 |

INFORMATION REQUESTED:

(NONE)

PROCEEDINGS HELD VIA ZOOM; WEDNESDAY, FEBRUARY 10, 2021
11:01 A.M.

DEPOSITION OFFICER: We are going on the record.

JULIAN VARGAS,
called as a deponent and sworn in by
the Deposition Officer, was examined
and testified as follows:

DEPOSITION OFFICER: Mr. Vargas, would you please raise your right hand.

Do you solemnly swear or affirm the testimony you are about to give shall be the truth, the whole truth, and nothing but the truth?

THE DEPONENT: Yes.

DEPOSITION OFFICER: Thank you.

EXAMINATION

BY MR. STEINER:

Q. Good morning, Mr. Vargas.

Can you state your full name and address for the record.

A. My name is Julian Vargas. My current address is 13741 Oxnard Street, Apartment 9, Van Nuys, California

A. The only one that I recall was this one that we're discussing today.

Q. And that was a visit that you made on January 10th, 2020; is that correct?

A. Yes.

Q. And to the best of your recollection, that is the one and only time you have visited a LabCorp patient service center; is that correct?

A. Actually, there were two visits total to the location.

Q. When was the second visit?

A. I think -- I mean, I'm not very good with the dates; but if it's okay, I could just more or less describe what the visits were.

Q. Sure.

A. I bel- -- basically after the experiences I've had previously with this type of check-in kiosk and difficulty getting assistance at these types of locations, and since this blood test in question was going to require me to come in fasting, I decided to visit LabCorp, I believe it was a day or two prior to the actual date of service, because I wanted to familiarize myself with how to find it and to familiarize myself with what the procedure was going to be when I got there.

So when I went there, I found my way to the window and got the attention of somebody there and explained, you know, what I was there for and asked about their check-in process; you know, would it involve a kiosk, and if so, could somebody show me where the kiosk was, because I wanted to know about it ahead of time, and would it be accessible for a blind person to use independently.

And at that point, I was told that the kiosk was not accessible for a blind person to use independently, so I would have to require a -- an attendant, you know, a person there to help me, which they assured me would be available.

So when I went in for service, I went in and I had to wait in the line. And then when it got to be my turn, I went to the window and asked for assistance. And after another few minutes of waiting, someone came out and took my cards, my medical insurance cards, and basically signed me in.

Q. And that was the January 10th date that you handed your cards and got signed in by a LabCorp attendant?

A. Yes.

Q. And you said you visited that facility a couple days prior to January 10th; is that right?

A. Yes. I believe it was a day or two before.
Q. The LabCorp facility that you visited, was that at 15211 Vanowen Street in Van Nuys?
A. Yes, that's correct.
Q. And why did you choose to go to that particular LabCorp facility?
A. I went to that one because it was the closest one to me.
Q. How did you discover that that LabCorp facility was the closest one to you?
A. I believe I asked Siri to find me the nearest location and that's what it returned.
Q. And how did you get to that location?
A. The day of the appointment, I believe I took a paratransit service.
Q. What about the couple days prior, when you went to speak with the LabCorp representative?
A. On that occasion I took the bus.
Q. So other than those two occasions that you've described, have you on any other occasions, either before or after LabCorp introduced its kiosks, gone to a LabCorp PSC?
A. No.
Q. And by "PSC," you understand I mean a patient service center?

Q. And when you got to the counter, there was someone there to help you; is that correct?

A. Yes.

Q. And can you tell me what you said to that person and what the person said to you?

A. I said "Hello."

And they asked the usual question, you know, did I have a prescription or how could they help me.

So I explained to them that I would be coming in there soon to have some bloodwork done that was requested by a doctor, and that I did have a prescription for it, and that -- I asked -- I told them that I wanted to familiarize myself with things about their location since it was going to be a fasting blood test and I didn't want to have to do all that, you know, while I was also hungry.

So I explained that I would need assistance. And I asked if there is a check-in kiosk at this location and, if so, could somebody direct me to it so I could familiarize myself with where it's located, and is it accessible so that a blind person can use it independently.

Q. And what did the representative say?

A. They said that they do have a kiosk, but that unfortunately, it was not something that a blind person

could use independently, it wasn't set up for that; and that I would just need to come to the desk or the window there on the day of service and that somebody -- they would make somebody available to help me.

Q. And was that the extent of your conversation?

A. More or less.

Q. Well, do you recall anything else from your conversation that day prior to January 10th, 2020?

A. I think -- well, when they told me that it was not accessible, I expressed disappointment and I explained that they should make their kiosks accessible so that a blind person could use it as well.

And they said they would -- they would take that information, but that unfortunately, at this time, it wasn't accessible.

Q. And so the alternative that they offered you was checking in at the desk, correct?

A. Right.

Q. I'm sorry. I missed that.

A. Yes.

Q. Now, did you ask if you could check in at the desk or they offered you the option to check in at the desk?

A. They offered it, being that the kiosk was inaccessible, according to their description of it. They

said, but somebody would help me. All I needed to do was come to the window or the desk at the date of the appointment, you know, the day that I needed the service, and that they would make someone available to help me with the check-in process.

Q. And that's what happened on January 10th, when you showed up for your actual appointment, correct?

A. Yes.

Q. Had someone asked you, sir, to visit the LabCorp location to examine the kiosk?

A. No.

Q. You did that on your own?

A. Correct.

Q. Were you already a party to the Quest litigation?

A. I had talked to my counsel about that. I don't know how far that had gotten at that point, but yes, I was involved in those talks.

And that is, I might add, part of the reason why I went to LabCorp, was because I thought, well, maybe -- maybe they might be better-equipped for accessibility.

Q. Before the complaint was filed in this matter, sir, did you review it?

A. Yes.

Q. And did you think it was important to make sure

the complaint was accurate?
A. Yes.
Q. And do you believe, sitting here today, that the allegations in the complaint are accurate?
A. Yes.
Q. And when you reviewed the complaint in preparation for your deposition here today, did you notice anything in it that you believed to be inaccurate?
A. The only thing that I noticed was that it didn't make reference to the previous visit that I had made, so that's why I wanted to clarify that detail.
Q. Understood.
And is it fair to say that on the date you visited the LabCorp facility with your prescription, they provided you with medical diagnostic testing services?
A. Yes.
Q. And no one at LabCorp ever refused to provide you with those services; is that correct?
A. Correct.
Q. And no one at LabCorp told you that checking in at the kiosk was the only option for checking in; is that correct?
A. No, I just understand it to be one of two options available.
Q. And the other option is to check in with a

person at the desk, correct?
A. Yes.
Q. And so you were never told that the only option for checking in at LabCorp was to check in at the kiosk, correct?
A. Correct.
Q. And since January 10, 2020, have you gone to any other LabCorp patient service centers?
A. No.
Q. Since January 10, 2020, have you revisited this same LabCorp patient service center?
A. No.
Q. So the one and only time that you went to LabCorp to receive a service, you were checked in at the desk, correct?
A. That's correct, and that's because that's the only time I -- the last time that my doctor has requested bloodwork.
Q. And when you visited the LabCorp patient service center on January 10, 2020, you were not required to use the kiosk to check in, correct?
A. I was not required because -- well, I was not required.
Q. Okay. And when you visited the LabCorp patient service center on January 10, 2020, you were not required

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS and JULIAN VARGAS, individually on behalf of themselves and all others similarly situated; and AMERICAN COUNCIL OF THE BLIND<br><br>Plaintiffs,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>Defendant. | CASE NO.: 2:20-cv-00893 |

**EXPERT REPORT OF RACHAEL BRADLEY MONTGOMERY**

Another solution would be to allow a headphone to be connected directly to the iPad and turn on the iOS VoiceOver application when a headphone plug is inserted. A tactile keypad is required for full compliance with standards but this solution would at least provide a possible way for a visually impaired individual to use the kiosk. If the iPad used does not provide a headphone jack, a separate headphone jack with volume control could be added and would cost around $155 (See page 6 Exhibit C) plus the cost of mounting it.

Another solution would be purchasing a kiosk from a company that provides accessible kiosks. A number of companies provide kiosks in a standard build (which is less expensive) for healthcare check-in that include options that make them fully accessible. One such example, Frank Mayer's Advantage Floor Standing Kiosk, meets ADA requirements and is designed to support an optional AudioNav keypad (See page 7 Exhibit C). This kiosk provides features comparable to the Aila kiosk purchased by LabCorp.

Each of the options discussed above would allow LabCorp to maintain the functionality and utility of its kiosks, while increasing the accessibility for blind users.

I reserve the right to supplement this section of my report after reviewing the deposition testimony of other Kiosk vendors that I understand plaintiffs' counsel is obtaining.

**C. The LabCorp website and iPhone mobile application are not independently accessible to blind users.**

I assessed the accessibility of LabCorp's website and iPhone mobile application for persons who use screen readers on 14 March 2021. Screen readers consist of software with which blind technology users can independently access and interact with properly coded websites and mobile applications. On a computer, they do so with a combination of hardware and software that allow someone who cannot see the screen to find, navigate, and interact with on-screen content using the keyboard instead of a mouse. When a website is properly developed, the software provides information about interface elements, such as hyperlinks, menus, buttons, form fields, and images. The most common type of software reads screen content and certain coding cues aloud by means of a speech synthesizer. It allows users to skim pages, screens, documents and tables by navigating with designated keystrokes. It also allows for efficient navigation based on lists the screen reader generates based on the code.

Case: 22-55873, 06/06/2022, ID: 12464500, DktEntry: 1-2, Page 91 of 141

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUKE DAVIS and JULIAN VARGAS, individually on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS; and DOES 1-10, inclusive,

Defendants.

CASE NO.: 2:20-cv-00893

---

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
LABORATORY CORPORATION OF AMERICA HOLDINGS 30(B)(6),
JOSEPH SINNING
Cape Girardeau, Missouri
Tuesday, February 2, 2021
Volume 1

Reported by:
LESLIE JOHNSON
RPR, CCRR, CSR No. 11451
Job No.: 4445335
PAGES 1 - 232

Case: 22-55873, 06/06/2022, ID: 12464500, DktEntry: 1-2, Page 92 of 141

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUKE DAVIS and JULIAN VARGAS, individually on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS; and DOES 1-10, inclusive,

Defendants.

CASE NO.: 2:20-cv-00893

__________________________________________________________

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF JOSEPH SINNING, Laboratory Corporation of America Holdings 30(b)(6), Volume 1, taken on behalf of Plaintiffs, at Cape Girardeau, Missouri, beginning at 10:05 a.m. and ending at 3:55 p.m., on Tuesday, February 2, 2021, before LESLIE JOHNSON, Certified Shorthand Reporter No. 11451.

BY MR. MILLER: 10:36:52
Q Do you have knowledge of any number of how many patients are served by LabCorp at their service centers throughout the United States?
A I know that we're seeing about 125,000 people a day across the country. 10:37:03
Q At how many patient service centers?
A Just under 1900.
Q And those are located throughout the United States? 10:37:20
A That is correct.
Q How many patient service centers are located within California?
A One second. I've got that number in my -- 299 locations. 10:37:34
Q Do you know how many patients on average LabCorp sees at their patient service centers in California?
MR. STEINER: Objection. Beyond the scope. 10:38:03
THE WITNESS: Yeah. I do not have that number with me.
BY MR. MILLER:
Q But it would certainly be a portion of the 125,000 that LabCorp sees per day; is that right? 10:38:11

Project Horizon; isn't that true? 10:46:37
A That is our kiosk project, sir.
Q And that project began in the 2016 time frame; is that correct?
A Yes, sir. 10:46:48
Q And the purpose of the project was to implement patient self-service at the LabCorp patient service centers, right?
MR. STEINER: Object to the form.
THE WITNESS: No. The purpose was to 10:46:59 create a tablet self-check-in service as an option for patients in our PSCs.
BY MR. MILLER:
Q So, effectively, you were attempting to create a self-check-in service for patients at each 10:47:09 one of your patient service centers; is that -- am I correct?
A It's a self-check-in option for patients. They can either use the tablet or they can go to our window and be serviced for the check-in purposes. 10:47:21
Q But now patients can do other things at the self-service center other than just check-ins; isn't that true?
MR. STEINER: Object to the form.
THE WITNESS: They can make a payment on 10:47:32

account or on an NOBD, which is notice of balance due. They can also do that at the front window. 10:47:34

BY MR. MILLER:

Q But as it relates specifically to the kiosks that have been placed in the patient service center, they can make a payment. That's another thing they can do other than to check in, right? 10:47:45

A Yes. There is a credit card machine on the side of it.

Q Can they change their appointments for the future? 10:47:55

A No, sir, they cannot.

Q Is that part of the functionality that's going to be rolled out eventually?

A It's in a backlog, but it has not been developed. 10:48:02

Q But does the company have plans to roll out the ability to schedule appointments through the kiosk check-in -- or excuse me.

Does LabCorp have plans to allow patients to make appointments through the kiosk? 10:48:17

A It's an idea that's been discussed, but there is no definitive plan as to when that may come to fruition.

Q As part of the Project Horizon, there was 10:48:32

assuming the role. The project was complete by the time that I assumed my role as this position. 10:51:17
So . . .
BY MR. MILLER:
Q We see here on the third risk scenario, "Patient arrives with seeing eye dog and is unable to check in with device." 10:51:27
Has anyone ever told you that one of the risk scenarios at the kiosk at the patient service center is the patient arriving with a seeing eye dog and unable to check in with a device? 10:51:41
A It's never been discussed as a risk assessment. We have a policy in place that has been communicated many times that we have employees in our PSCs that are there to help patients that either will not, cannot, or won't use the tablet. We've never taken that position away, and we have no intentions of doing so. 10:51:58
Q Are any of those employees who are directed to assist phlebotomists? 10:52:17
A They are.
Q How many of them are phlebotomists as opposed to staff that just handle check-ins?
MR. STEINER: Object to the form.
THE WITNESS: We have very few PIRs -- I 10:52:30

don't have the exact number in my head -- which is a patient intake representative. The vast majority of the people working in our patient service centers doing patient care and intake are phlebotomists. 10:52:32

BY MR. MILLER: 10:52:47

Q Has there been any reduction in patient intake representatives following the implementation of Project Horizon?

A I don't have direct knowledge if it was a PIR that was reduced or not. What we did, because 10:52:58 of the efficiencies gained, was move some people to part-time versus full-time. We have not eliminated any positions in general because of the tablet.

Q But there has been a reduction in hours as a result of the tablet; isn't that true? 10:53:17

A Yes, based on the efficiencies that we have gained in doing this process.

Q But you can't tell me how many hours has been reduced?

A No, sir, I cannot. 10:53:29

Q Or how many -- or what positions they relate to?

A Not directly, no, sir.

Q Who would be the individual, to your knowledge, within LabCorp that would possess that 10:53:42

Case: 22-55345, 06/06/2022, ID: 12464500, DktEntry: 1-2, Page 98 of 141

at the front desk to be able to tell -- to tell that information? 11:38:21

A At our Walgreens locations, it's the Walgreens team members that would help that person check in, not us, because there's not a front desk at Walgreens. That's part of our agreement with Walgreens, that they're there to assist the patients if they need it. 11:38:30

Q Then why would you have the bell ring the phlebotomist in the back? 11:38:45

A So that we know somebody was -- had checked in.

Q Well, if there was somebody at the front desk to service the individual, why would the phlebotomist need to know that? 11:38:56

A At the Walgreens we do not have a front desk. That's why we have an agreement with Walgreens to assist anybody that needs assistance.

Q Has the bell functionality been implemented only at the Walgreens? 11:39:11

A Yes.

Q Has it been implemented at any other patient service centers?

A Not to my knowledge.

Q Are there any patient service centers 11:39:28

within the United States where the phlebotomists are 11:39:30
the individuals responsible for handling the
check-in, if people can't check in vis-à-vis the
kiosk or on their smartphone?
A State that again. 11:39:42
Q Are there any patient service centers
within the United States where the phlebotomists
have the primary responsibility of checking in
individuals who can't check in on the kiosk or their
smartphone? 11:39:55
MR. STEINER: Object to the form.
THE WITNESS: All of our employees that
work in patient service centers are there to assist
patients if they need it.
BY MR. MILLER: 11:40:05
Q Including the phlebotomists?
A Yes.
Q Is it true that there are patient service
centers that only employ one employee at their
center? 11:40:15
A Yes.
Q And isn't it true that there -- bear with
me here.
Isn't it true there is over 440 locations
throughout the United States where there is only one 11:40:28

And I'm not sure what you're referring to as far as scope changes. 11:44:58

Q All right. Project Horizon was rolled out by LabCorp to the patient service centers in 2018; is that accurate? 11:45:10

A Yes.

Q And do you know specifically when that project began being rolled out to the patient service centers in 2018?

A It would have been October of 2017 when it started. 11:45:19

Q And how do you have that information?

A There was a discussion with Mark Wright, Lori Crozier and Richard Porter.

Q Am I correct in understanding, though, that the bulk of the rollout to patient service centers occurred in 2018, after January of 2018? 11:45:40

MR. STEINER: Objection to the form.

THE WITNESS: That is my understanding, that Richard Porter was running that project. 11:45:51

BY MR. MILLER:

Q Does Mr. Porter have more knowledge -- or strike that.

Would Mr. Porter have more knowledge than you as to the dates that various patient service 11:46:12

patient themselves, the check-in system that's been implemented through the Horizon project has to be used by one of those two sources. It's not optional? 01:02:26

MR. STEINER: Objection to form. 01:02:38

THE WITNESS: That is what we've asked people to do.

BY MR. MILLER:

Q Am I correct that the same software that is available at the kiosk for patients' self-check-in is the same software utilized at the window? 01:02:43

A Yeah. It's called Express Admin at the window, but yes, it's the same technology, just not using a tablet. 01:02:59

Q In other words, is the technology integrated between what's available at the self-check-in kiosk and what's available at the window?

A Yes. 01:03:09

Q And is the technology also integrated with the check-in process vis-à-vis LabCorp's website?

MR. STEINER: Object to the form.

THE WITNESS: Well, there's not a check-in process via the website. It's a check-in for an 01:03:20

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUKE DAVIS and JULIAN VARGAS, )
individually on behalf of ) Case No. 2:20-cv-00893
themselves and all others )
similarly situated, )
Plaintiff, )
vs. )
LABORATORY CORPORATION OF )
AMERICA HOLDINGS; and DOES )
1-10, inclusive, )
Defendant. )
__________________________________)

DEPOSITION OF MARK WRIGHT

TAKEN MARCH 4, 2021

REPORTED REMOTELY BY:
BEVERLY A. BENJAMIN, CSR No. 710
Notary Public

principals.

We also during discussions of physical and cyber security also consulted with our internal security team, but they weren't primary participants in the discussion about finalizing the physical design of the enclosure.

Q. So during any of those discussions among Aila and PointSource and your internal team, was there any discussion at all or any analysis performed as to the issue of whether the kiosks should be made accessible for blind people?

MR. STEINER: Object to the form.

THE WITNESS: I would put it a different way. One of our design targets was to make the device as accessible as physically possible within the design constraints that we had.

I'm going to answer your question this way: We found it not at all physically practical within our design constraints to service blind people, and we designed the solutions so that blind people could be serviced at the desk, because we also built the solution to operate behind the desk in the same efficient way that it operated on the tablet.

So we had to make design decisions to make it accessible to wheelchair-bound people and low vision

people, but we explicitly recognized that the device could not service a blind person, and they would have to be serviced by the Express solution behind the desk.

Q. (BY MR. SWEET) So there were discussions around the issue of accessibility for blind people among this group?

A. Yes, but it was a short discussion.

Q. And who was involved in those discussions, sir?

A. The same integrated design team that I was leading at the time that involved Aila and PointSource and my internal team.

Q. And are there any memos or emails or other documentation of these discussions?

A. Not that I'm aware of. The documentation for how the design was implemented is certainly contained on our documentation platforms that we use to build software.

However, I think I'm answering your question fairly directly that we had design intent that anyone that was disabled and unable or preferred not to use the tablet could be serviced equally as well or better from the desk because of the technology solution we built as part of the Express solution to enable fast check-in at the desk.

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUKE DAVIS, JULIAN VARGAS, AND
AMERICAN COUNCIL OF THE BLIND,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,
Plaintiffs, Case No.
vs. 2:20-cv-00893-FMO-KS
LABORATORY CORPORATION OF
AMERICA HOLDINGS,
Defendant.
_______________________________/

Pursuant to Notice, the remote video deposition of CLAIRE STANLEY was taken on Monday, December 7, 2020, commencing at 10:00 a.m., before David C. Corbin, a Registered Professional Reporter and Notary Public.

REPORTED BY: David Corbin, RPR

as being visually impaired?
A. No, we do not.
Q. So if someone wears glasses and their vision can be corrected to 20/20 or something close, would that person be defined as visually impaired?
A. Again, we don't get nit picky on where your visual acuity lies. It's a personal identification.
Q. Okay. So are there any specific requirements to join ACB as a member?
A. Nope. Even sighted people are allowed to join.
Q. So of the 20,000 members that you have, fair to say some are -- some are totally blind, some are sighted, and then there are others that are somewhere in between?
A. Yes.
Q. And those somewhere in between would -- some would lean more towards totally blind and some would lean more towards being able to see with corrective lenses, correct?
A. Yes. But I can't give you a percentage. I don't know that.
Q. Does ACB survey its members to determine where they fall in terms of the spectrum for visual

acuity?
A. We are beginning, and I mean very early infancy stage, to collect that data. But at this time, no, we don't have that information.
Q. Okay. So you can't tell me if a majority of ACB members are totally blind or if a majority of them are visually impaired and to what level?
A. No, I can not.
Q. Has -- you said ACB is beginning to -- that process. What are they doing to begin that process?
A. Developing a survey.
Q. Has that survey been sent out?
A. No.
Q. And does the survey ask members to quantify in any way their level of visual impairment?
A. No.
Q. How does the survey propose to identify the level of visual impairment for its membership?
A. It asks basic questions based on a few very short identifications that again are based on people's identification. It's not a, you know, number system or anything like that.
Q. So it's descriptive. It's not like your

20/200 or something like that in terms of your level of vision?

A. Correct. Your acuity is not asked.

Q. So I take it on the survey there are a number of categories from blind to able to -- to sighted; is that right?

A. Yes. Very, very basic. Very broad strokes identification.

Q. And how many categories are there?

A. I don't recall.

Q. Is it more or less than five?

A. Probably less. But I don't recall.

Q. And is it fair to say that based on the level of visual impairment individuals in ACB have that they might need different accommodations in order to participate in certain activities?

A. Yes.

Q. And so if one is totally blind, they might need accommodations that someone who is simply visually impaired may not need; is that correct?

A. That's correct. No two people with a visual impairment need the same accommodation.

Q. And are there some members of ACB who to your knowledge need no accommodation in order to participate in daily life activities?

A. The list of suggestions is in the letter that we provided.

Q. The letter doesn't include a request that Lab Corp allow its employees to check patients in, correct?

A. Yes.

Q. Is there a reason why that's not a request made in the letter?

A. I'm not sure.

Q. Now, one of the requests that is made in the letter is providing speech output that provides information a blind user needs as the user navigates through the kiosk workflow, correct?

A. Correct.

Q. And are there certain people that notwithstanding such speech output, is it your belief they would still have difficulty navigating the kiosk?

A. Can you rephrase that.

Q. Sure. Is providing speech output, will that resolve the accessibility concerns of everyone that is blind or visually impaired?

A. No one accommodation is going to accommodate every person everywhere.

Q. Okay. Because everyone has different

levels of impairment and different comfort levels with the technology that might be offered to accommodate their disability, correct?

A. Correct.

MR. HANDLEY: Can I stop one second. Does someone have an animal that they need tending to.

A. I was going to say that. My dog is -- yeah, she is chomping at the bit. I should probably take her out.

MR. STEINER: I don't have very much more but why don't we do this. Why don't we go off the record for -- tell me how long you need, I'm happy to take 15, 20 minutes.

A. I don't even need that. Probably just five, ten minutes. She is getting stir crazy.

MR. STEINER: Let's take ten minutes. And then I don't make any promises, but hopefully we can be done within the hour after that.

(Short break was taken.)

BY MR. STEINER:

Q. Ma'am, we're back on the record. Among the requests that ACB makes is for a tactile keypad for navigation of the check-in kiosks. Are you aware of that?

a legal conclusion. But go ahead and answer, Claire.

A. It would be preferable than having to rely on another human being that is not an employee of Lab Corp.

Q. So it is ACB's preference that a staff member be available to check in people that are blind or visually impaired, correct?

A. Correct.

Q. And is that more preferable to having a kiosk that provides speech output?

A. I would not -- I wouldn't choose either or. I see them as options.

Q. Options for accommodations for people who are blind or visually impaired, correct?

A. Correct.

Q. Is there a specific remedy that you're looking for for people such as Mr. Harden who have been able to check in with a receptionist where private information is never spoken?

A. No.

Q. Is there any remedy that you're looking for in people of Mr. Harden's situation?

A. No.

Q. Other than the lawsuit against Quest, has

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
CASE NO.: 2:20-CV-00893-FMO-KS

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually, and on behalf of all others similarly situated,

Plaintiffs,

vs.

LABORATORY CORPORATION OF AMERICAN HOLDINGS; and DOES 1 through 10,

Defendants.

______________________________________________/

February 17, 2021
Videoconference Deposition
9:07 a.m. - 10:11 a.m.

VIDEOCONFERENCE ZOOM
DEPOSITION OF JOHN HARDEN

Taken before Angela Saxon, Professional Court Reporter and Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

A Yeah, personal computer, home computers.
Q And what was your next job, sir?
A 2000 I retired.
Q And do you currently have any employment?
A I currently do a little bit of braillewriter repair just as a hobby more than anything else.
Q Do you read Braille, sir?
A Yes.
Q Sir, are you visually impaired?
A Yes.
Q And are you -- can you describe your level of visual impairment?
A Totally blind now. I was able to see a little bit as a younger person, never been able to read print very well.
Q When would you say approximately that you became totally blind?
A Oh, it kind of went slowly, but I would say sometime between 2000 and 2010.
Q Have you ever been a party to a litigation, sir?
A Repeat.
Q Sure. Have you ever been a plaintiff in a litigation or a defendant in a litigation?

Q And the first question, sir, was have you attempted to access LabCorp's facilities through the use of the E-kiosk check-in system in the past three years. Do you recall that question, sir?

A If it was on the survey, yes.

Q And then do you recall responding: No, I walk in and go to the window just as I always did, and the receptionist checks me in just like she always did. In fact, I was unaware there was an E-kiosk. Is that your answer, sir?

A That sounds familiar, yes.

Q And was that a true and accurate answer of your experience going to that --

A Yes.

Q Let me just finish my question.

MR. HANDLEY: Let him finish the question, Mr. Harden. Thanks.

THE WITNESS: Sorry.

BY MR. STEINER:

Q Was that a true and accurate statement of your experiences going to LabCorp's Patient Service Centers within the last three years prior to responding to the survey?

A Yes.

Q Do you recall, sir, being asked the

is that correct?
A That is correct. And it's Beville Road, not Bellview.
Q I apologize, sir, Beville Road.
A Hey, it's a strange spelling. It's an easy mistake.
Q Thank you. And since you responded to this survey on June 26, 2020, have you continued to go to the LabCorp Patient Service Center at Beville Road in South Daytona Florida?
A Yes.
Q And have your experiences going to that location been the same as they were at the time you responded to this survey on June 26, 2020?
A Yes.
Q And how many times would you estimate you've been to that LabCorp Patient Service Center on Beville Road since June 26, 2020?
A Well, every three months, so three times.
Q You go to that LabCorp Patient Service Center approximately every three months; is that correct?
A That is correct.
Q And when you go to that patient service center, what goods or services are you seeking from

LabCorp?
A Leaving a blood sample for them to do their tests on for as ordered by my physician.
Q And on every instance, sir, that you've been to that location in the last three years, have you been able to get the goods and services from LabCorp that you were there for?
A Yes.
Q Have you ever been denied any goods and services from LabCorp at a patient service center?
A No.
Q Sir, I'm going to skip question three and go to question four on the survey. The question was, Have you ever -- sorry, excuse me, Have you attempted to access LabCorp's E-kiosk check-in system and were forced to disclose private information to another person to get help signing in. Do you recall that question, sir?
A Yes.
Q And your response was: I hand my ID card to the receptionist and private information is never spoken to anyone. Do you recall that response, sir?
A Yes.
Q Was that an accurate response relating to your experience at the Beville Road LabCorp Patient

Service Center over the last three-and-a-half years?
A Yes.
Q Sir, you wrote on the survey response dated June 26, 2020, ADA states that a business needs to make reasonable accommodations for the disabled; they certainly do that. Do you recall that response, sir?
A Yes.
Q Was that an accurate response relating to your experiences at LabCorp's Beville Road Patient Service Center over the last three years?
A Yes.
Q And since you filled out that survey, has anything happened at any of the LabCorp Patient Service Center on Beville Road that would cause you to change any of your responses to this survey?
A No.
Q Sir, the last time you were at a LabCorp Patient Service Center was when?
A It was the middle of January. The exact date, I couldn't say.
Q That's fine. The middle of January 2021?
A Yes.
Q And you would have been at a patient service center approximately in the middle of

yourself?

A I don't believe so. I don't remember.

Q What is your wife's name, sir?

A Teresa Faye Harden.

Q Does Ms. Harden have visual impairment?

A Yes.

Q Is Ms. Harden legally blind?

A Yes.

Q And so I take it from your testimony that the two of you obtain goods and services from that LabCorp Patient Service Center on Beville Road, correct?

A Yes.

Q Are you aware of any instance where Ms. Harden, your wife, has been denied any goods and services from the patient service center on Beville road?

A She has not been denied any services.

Q Has your wife to your knowledge been able to check in at the window in the last four years?

A Yes.

Q Has she ever been required to use the kiosk to check in?

A No.

Q Have you ever been required to use the

kiosk to check in?
A No.
Q As to Ms. Harden, does she require laboratory testing services at the same frequency that you do, sir?
A Yes.
Q So approximately every three months?
A Approximately.
Q So the two of you collectively over the last four years would have been at a LabCorp Service Center approximately, what is that, 32 times?
A Probably.
Q And on each and every occasion that you've gone, the two of you have gone, of those 32 times you've been able to check in at the desk, correct?
A Correct.
Q You have never been required on any of those 32 times to check in at the kiosk, correct?
A That is correct.
Q Sir, when you were at the location on Beville Road in January of this year, you were able I take it to physically access that location?
A Yes.
Q You entered the location and then tell me what you would do.

Page 1

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LUKE DAVIS, JULIAN | : | |
| VARGAS, and AMERICAN | : | CASE NO. |
| COUNCIL OF THE BLIND, | : | 2:20-CV-00893-FMO-KS |
| individually, and on | : | |
| behalf of all others | : | |
| similarly situated, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LABORATORY CORPORATION | : | |
| OF AMERICA HOLDINGS; and | : | |
| DOES 1 through 10, | : | |
| Defendant. | : | |

DEPOSITION VIA ZOOM OF:
RACHAEL BRADLEY MONTGOMERY, Ph.D.
THURSDAY, APRIL 15, 2021

REPORTED BY:
SILVIA P. WAGE, CCR, CRR, RPR

Case: 22-55103, 06/06/2022, ID: 12464500, DktEntry: 11-2, Page 121 of 141



blind users.

A. Okay.

Q. And, as I understand your testimony, it's that the technical changes to the kiosk that you propose would make check-in at the kiosk accessible to, I think, you used the word a vast majority of blind people; is that right?

A. So it is correct that the changes I am recommending would be required. They may not be sufficient.

Q. "Required" to make the check-in kiosk accessible to the vast majority of blind people, right?

A. Correct, yes.

Q. But there would be blind people who still would require desk check-in; is that correct?

A. That is conceivably possible, yes.

Q. And is it fair to say that check-in at the desk will allow all legally blind users to check in for LabCorp's services?

MR. HANDLEY: Objection, calls for information outside the scope of the witness's assigned task.

A. Again, there are factors beyond just whether or not it's accessible. But, assumably, if

A. I was. However, my disability does not in any way interfere with communication in that way.

Q. In other words, the person at the desk would speak to you and tell you what you needed, right?

A. Correct.

Q. And you found that to be an adequate method of communication with the individual at the desk?

A. I did, yes.

Q. But it's fair to say, Ma'am, that even with your proposal in Paragraph 1 on Page 2, some legally blind people would not be able to check in at the kiosk independently, correct?

A. It is my opinion that if these modifications were made and the speech output was provided to allow navigation, that the majority would. But it is hard to say -- it is hard to say that absolutely everyone would because there are different situations.

Q. And you didn't study the preference of legally blind people when it comes to checking in at a LabCorp Patient Service Center?

A. I did not.

throughout. And so there are a number of ways to make that relatively easy including linting, including tests for accessibility as part of the unit test, as part of the developer test and, especially, part of validation changes before changes to the website are upgraded.

Q. You indicated that you tested the 2017 website.

A. I went back and tested pieces of the site that were available on the Wayback Machine.

Q. And why did you do that?

A. I did that because I -- if the 2017 site was accessible, I wanted to be able to speak to that because it was the beginning of this -- the kiosk deployment and I felt it was relevant to look at the history as much as I could.

Q. Did you -- so you looked at the website in 2017 because it's your understanding that the kiosks were being deployed in 2017?

A. I looked at the website for a reasonable amount of time, 2017 being where I thought based on the documents seemed reasonable.

But to, specifically, answer your question about why, as you noted, websites can have small errors that happen over time. I was trying to

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>Defendant. | Case No.: 2:20-cv-00893-FMO-KS |

**EXPERT REPORT OF**
**BRUCE DEAL**

**March 8, 2021**

**CONFIDENTIAL**

Case: 22-55873, 06/06/2022, ID: 12464500, DktEntry: 12-2, Page 125 of 141

CONFIDENTIAL

## TABLE OF CONTENTS

**I. Qualifications ........ 1**

**II. Case Background ........ 1**

**III. Assignment ........ 3**

**IV. Summary of Opinions ........ 3**

**V. Using Census Data Is Not an Accurate Methodology to Estimate the Number of Class Members ........ 4**

A. Broad Nationwide Numbers Do Not Correspond to the Patients that Visit Labcorp's PSCs ........ 5

B. Broad Nationwide Statistics Do Not Capture Individualized Patient Choices for Laboratory Testing Services ........ 7

C. Broad Nationwide Statistics Do Not Capture Location-Specific Kiosk Availability.. 8

**VI. An Analysis of Whether Visually Impaired Persons Received Inferior Services Compared to Sighted Patients, and/or Whether Such Persons Were Harmed, Requires Individualized Inquiry ........ 10**

A. Patients' Individualized Check-In Experiences Impact Whether or Not They Have Received Inferior Services and/or Experienced Any Harm ........ 10

B. Not All Visually-Impaired Patients Are Unable to Use the Kiosks ........ 13

**VII. Conclusion ........ 14**

CONFIDENTIAL

**Exhibit 1b**
**Population, Vision Difficulty, and Labcorp Visits by State**

| | *[a]* | *[b] = [a]/[c]* | *[c]* | *[d] = [c]/sum[c]* | *[e] = [a]/sum[a]* | *[f]* | *[g] = [f]/sum[f]* |
|---|---|---|---|---|---|---|---|
| | Visual Difficulty[A] | | | | | Labcorp Visits[B] (Jan. 2018 - Dec. 2020) | |
| State | Estimated People with Vision Difficulty *(count)* | Prevalence of Vision Difficulty *(% of Total State Pop.)* | Total State Population | State Population *(% of Total U.S. Pop.)* | People with Vision Difficulty by State *(% of U.S. Pop. With Vision Difficulty)* | Visits to Labcorp Locations (count) | Visits to Labcorp Locations (% of Total) |
| California | 747,867 | 1.9% | 38,997,581 | 12.0% | 9.7% | 10,290,146 | 14.9% |
| Texas | 695,054 | 2.4% | 28,514,428 | 8.7% | 9.1% | 4,919,905 | 7.1% |
| Florida | 538,105 | 2.5% | 21,156,770 | 6.5% | 7.0% | 9,633,016 | 13.9% |
| New York | 388,524 | 2.0% | 19,212,803 | 5.9% | 5.1% | 3,736,208 | 5.4% |
| Pennsylvania | 291,394 | 2.3% | 12,593,136 | 3.9% | 3.8% | 4,029,887 | 5.8% |
| Ohio | 266,651 | 2.3% | 11,514,951 | 3.5% | 3.5% | 1,137,292 | 1.6% |
| Illinois | 258,935 | 2.1% | 12,488,377 | 3.8% | 3.4% | 796,454 | 1.2% |
| Georgia | 255,907 | 2.5% | 10,420,412 | 3.2% | 3.3% | 1,678,541 | 2.4% |
| North Carolina | 244,982 | 2.4% | 10,281,062 | 3.2% | 3.2% | 2,299,273 | 3.3% |
| Michigan | 224,302 | 2.3% | 9,879,486 | 3.0% | 2.9% | 201,258 | 0.3% |
| Puerto Rico | 210,178 | 6.6% | 3,169,528 | 1.0% | 2.7% | 0 | 0.0% |
| Tennessee | 206,380 | 3.1% | 6,719,315 | 2.1% | 2.7% | 589,358 | 0.9% |
| Virginia | 184,978 | 2.2% | 8,303,671 | 2.5% | 2.4% | 2,410,878 | 3.5% |
| Arizona | 178,769 | 2.5% | 7,165,904 | 2.2% | 2.3% | 2,259,817 | 3.3% |
| Louisiana | 173,757 | 3.8% | 4,539,690 | 1.4% | 2.3% | 642,030 | 0.9% |
| New Jersey | 167,689 | 1.9% | 8,775,976 | 2.7% | 2.2% | 7,946,116 | 11.5% |
| Kentucky | 161,551 | 3.7% | 4,384,896 | 1.3% | 2.1% | 651,298 | 0.9% |
| Missouri | 158,184 | 2.6% | 6,020,665 | 1.8% | 2.1% | 925,531 | 1.3% |
| Indiana | 157,096 | 2.4% | 6,631,529 | 2.0% | 2.0% | 732,822 | 1.1% |
| Alabama | 150,989 | 3.1% | 4,822,514 | 1.5% | 2.0% | 692,724 | 1.0% |
| South Carolina | 147,752 | 2.9% | 5,048,513 | 1.5% | 1.9% | 948,985 | 1.4% |
| Washington | 145,299 | 1.9% | 7,497,453 | 2.3% | 1.9% | 1,486,702 | 2.2% |
| Oklahoma | 133,942 | 3.5% | 3,871,658 | 1.2% | 1.7% | 134,319 | 0.2% |
| Massachusetts | 112,017 | 1.6% | 6,820,969 | 2.1% | 1.5% | 132,945 | 0.2% |
| Maryland | 111,669 | 1.9% | 5,945,846 | 1.8% | 1.5% | 4,488,604 | 6.5% |
| Colorado | 109,868 | 1.9% | 5,664,199 | 1.7% | 1.4% | 1,534,566 | 2.2% |
| Mississippi | 109,074 | 3.8% | 2,904,609 | 0.9% | 1.4% | 114,715 | 0.2% |
| Arkansas | 101,638 | 3.4% | 2,962,596 | 0.9% | 1.3% | 68,016 | 0.1% |
| Oregon | 101,405 | 2.4% | 4,175,002 | 1.3% | 1.3% | 98,173 | 0.1% |
| Wisconsin | 96,271 | 1.7% | 5,751,404 | 1.8% | 1.3% | 132,461 | 0.2% |
| Minnesota | 84,900 | 1.5% | 5,580,828 | 1.7% | 1.1% | 115,843 | 0.2% |
| New Mexico | 76,108 | 3.7% | 2,058,918 | 0.6% | 1.0% | 41,931 | 0.1% |
| Kansas | 70,275 | 2.5% | 2,851,831 | 0.9% | 0.9% | 129,793 | 0.2% |
| West Virginia | 68,981 | 3.9% | 1,762,052 | 0.5% | 0.9% | 337,207 | 0.5% |
| Nevada | 68,615 | 2.3% | 3,043,419 | 0.9% | 0.9% | 1,088,383 | 1.6% |
| Connecticut | 65,651 | 1.9% | 3,514,562 | 1.1% | 0.9% | 133,324 | 0.2% |
| Iowa | 54,449 | 1.7% | 3,111,914 | 1.0% | 0.7% | 114,249 | 0.2% |
| Utah | 45,489 | 1.4% | 3,178,394 | 1.0% | 0.6% | 255,978 | 0.4% |
| Idaho | 41,207 | 2.3% | 1,764,911 | 0.5% | 0.5% | 166,596 | 0.2% |
| Nebraska | 38,381 | 2.0% | 1,904,211 | 0.6% | 0.5% | 41,871 | 0.1% |
| New Hampshire | 25,969 | 1.9% | 1,343,337 | 0.4% | 0.3% | 170,098 | 0.2% |
| Hawaii | 25,381 | 1.9% | 1,358,715 | 0.4% | 0.3% | 0 | 0.0% |
| Maine | 24,995 | 1.9% | 1,327,623 | 0.4% | 0.3% | 0 | 0.0% |
| Montana | 24,146 | 2.3% | 1,053,646 | 0.3% | 0.3% | 28,141 | 0.0% |
| Rhode Island | 20,216 | 1.9% | 1,043,753 | 0.3% | 0.3% | 34,092 | 0.0% |
| Delaware | 19,896 | 2.1% | 956,378 | 0.3% | 0.3% | 1,333,001 | 1.9% |
| South Dakota | 19,266 | 2.2% | 867,305 | 0.3% | 0.3% | 11,994 | 0.0% |
| Vermont | 15,123 | 2.4% | 618,064 | 0.2% | 0.2% | 0 | 0.0% |
| Wyoming | 15,118 | 2.7% | 568,859 | 0.2% | 0.2% | 30,387 | 0.0% |
| North Dakota | 14,844 | 2.0% | 744,172 | 0.2% | 0.2% | 0 | 0.0% |
| Alaska | 14,339 | 2.0% | 705,772 | 0.2% | 0.2% | 34,151 | 0.0% |
| District of Columbia | 13,642 | 2.0% | 696,599 | 0.2% | 0.2% | 320,832 | 0.5% |
| **Total** | **7,677,218** | **2.4%** | **326,290,206** | **100.0%** | **100.0%** | **69,099,911** | **100.0%** |

**Notes:**
[1] The American Community Survey classifies a respondent as having "Vision Difficulty" if they respond positively that they are are "blind or … [have] serious difficulty seeing even when wearing glasses" (see source [C]).
[2] Visits to Labcorp locations are aggregated over the period of January 2018 through December 2020 on a statewide basis using the state provided in the Labcorp "Site Address" and the "Number of Visits" field from each of the sources listed in [B].

**Sources:**
[A] U.S. Census Bureau, "American Community Survey Dataset ACSDT1Y2019," 2019, available at https://data.census.gov/cedsci/table?q=vision&g=0100000US.04000.001&tid=ACSDT1Y2019.B18103&tp=true&hidePreview=true.
[B] Davis-LabCorp00004749, Davis-LabCorp00004750, Davis-LabCorp00004752.
[C] U.S. Census Bureau, "American Community Survey and Puerto Rico Community Survey 2019 Subject Definitions," 2019, available at https://www2.census.gov/programs-surveys/acs/tech_docs/subject_definitions/2019_ACSSubjectDefinitions.pdf.

CONFIDENTIAL

**Exhibit 4**
**Patient Service Center Check-in Metrics**
**August 23, 2020 to Feburary 19, 2021**

| Date Range | [a] Kiosk Check-ins (count) | [b]=[a]/[g] Kiosk Check-ins (%) | [c] Mobile Check-ins (count) | [d]=[c]/[g] Mobile Check-ins (%) | [e] Front Desk Check-ins (count) | [f]=[e]/[g] Front Desk Check-ins (%) | [g] Total Check-ins (count) |
|---|---|---|---|---|---|---|---|
| 8/23/2020 - 8/31/2020 | 426,118 | 66.0% | 53,668 | 8.3% | 165,590 | 25.7% | 645,376 |
| 9/1/2020 - 9/30/2020 | 1,581,064 | 67.2% | 183,968 | 7.8% | 587,139 | 25.0% | 2,352,171 |
| 10/1/2020 - 10/31/2020 | 1,686,211 | 67.7% | 190,179 | 7.6% | 613,273 | 24.6% | 2,489,663 |
| 11/1/2020 - 11/30/2021 | 1,444,755 | 65.9% | 223,981 | 10.2% | 524,515 | 23.9% | 2,193,251 |
| 12/1/2020 - 12/31/2020 | 1,484,034 | 65.1% | 272,722 | 12.0% | 523,731 | 23.0% | 2,280,487 |
| 1/1/2021 - 1/31/2021 | 1,502,923 | 65.2% | 267,584 | 11.6% | 535,249 | 23.2% | 2,305,756 |
| 2/1/2021 - 2/19/2021 | 686,691 | 56.6% | 168,131 | 13.9% | 358,749 | 29.6% | 1,213,571 |
| **Total** | **8,811,796** | **65.4%** | **1,360,233** | **10.1%** | **3,308,246** | **24.5%** | **13,480,275** |

**Note:**
Data was reported on a rolling 180 day basis as of February 19, 2021, over the time period August 23, 2020 to Feburary 19, 2021.

**Source:**
Davis-LabCorp00004753-00004754.

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>Defendant. | Case No.: 2:20-cv-00893-FMO-KS |

**EXPERT REBUTTAL REPORT OF BRUCE DEAL**

**April 21, 2021**

**CONFIDENTIAL**

## TABLE OF CONTENTS

**I. Background & Assignment ..... 1**

**II. Summary of Opinions ..... 1**

**III. Mr. Chasworth's Wide Range of Estimates of the Size of the California Subclass Reveals the Unreliability of His Methodology ..... 2**

**IV. Mr. Chasworth Assumes that All Legally Blind Individuals Were Harmed ..... 4**

A. Half of Mr. Chasworth's Estimates Assume Every Legally Blind Individual in a Given Area Visited a Labcorp PSC Every Year ..... 5

B. Even for the Half of Mr. Chasworth's Estimates for which He Partially Accounts for How Many Individuals May Have Actually Visited a Labcorp PSC, He Applies a Faulty Market Share that Does Not Account for Labcorp's Business Model ..... 6

C. Mr. Chasworth Does Not Account for Variation in Kiosk Availability ..... 7

D. Mr. Chasworth Does Not Account for Variation in Patients' Individualized Check-In Experiences ..... 9

**V. Conclusion ..... 11**

CONFIDENTIAL

## I. BACKGROUND & ASSIGNMENT

1. My name is Bruce Deal. I previously submitted an expert report in this matter on March 8, 2021 ("Deal Report")[1] in this matter. My qualifications are outlined in the Deal Report.

2. Following the submission of my report, Sean Chasworth submitted a report on March 23, 2021 on behalf of Plaintiffs ("Chasworth Report").[2] The Chasworth Report provides five estimates of the potential size of the nationwide class and eight estimates of the potential size of the California subclass. I describe Mr. Chasworth's methodology in detail in **Appendix A** and summarize all 13 of the estimates presented by Mr. Chasworth for the California subclass and nationwide class in **Exhibits 1** and **2**.

3. After reviewing the Chasworth Report, my opinions as expressed in the Deal Report remain unchanged. I have been asked by counsel for Labcorp to respond to the Chasworth Report. **Appendix B** contains a comprehensive list of all documents and data that I considered for my assignment.

## II. SUMMARY OF OPINIONS

4. The Chasworth Report provides a wide range of estimates for the proposed nationwide class and California subclass, varying based on the data source, level of aggregation of the data, and whether they incorporate a market share adjustment. For the California subclass, Mr. Chasworth's smallest estimate is 1,575 individuals and his largest estimate is 112,140, more than *70 times* as high.[3] The sheer variability in these estimates demonstrates that Mr. Chasworth's approach does not produce a reliable estimate and underscores the fact that the estimates themselves reflect broad generalizations and flawed assumptions rather than a careful accounting of who the individual class members are.

---

[1] Expert Report of Bruce Deal, *Luke Davis et al. v. Laboratory Corporation of America Holdings*, Case No. 2:20-cv-00893-FMO-KS, March 8, 2021 ("Deal Report").

[2] Expert Report of Sean Chasworth, *Luke Davis et al. v. Laboratory Corporation of America Holdings*, March 23, 2021 ("Chasworth Report").

[3] Chasworth Report, p. 6.

CONFIDENTIAL

5. All of Mr. Chasworth's estimates are also flawed in that they rely on several flawed assumptions that are contradicted by the evidence, including evidence I discussed in the Deal Report:

- For half of his estimates, Mr. Chasworth assumes that *every single* blind person living in the same geographic area (zip code, city, or county) where at least one Labcorp PSC is located, visited a Labcorp PSC every year. Mr. Chasworth provides no basis for this assumption, which is flawed on its face, as Labcorp is far from the only option for diagnostic testing.

- For the other half of his estimates, Mr. Chasworth attempts to adjust for Labcorp's market share, but in so doing he assumes that all of Labcorp's revenue is derived from testing at PSCs. This assumption is contradicted by the evidence, including deposition testimony from Labcorp employees that PSCs account for only 20% of Labcorp revenue.

- All of Mr. Chasworth's estimates assume that all legally blind individuals visiting a Labcorp PSC would necessarily visit a PSC with a functioning kiosk. This assumption is again contradicted by the evidence, which shows that kiosks were rolled out at PSCs over time, that some PSCs in California do not have kiosks, and that there were periods of time where certain kiosks were not operational.

- All of Mr. Chasworth's estimates assume that all legally blind individuals visiting a Labcorp PSC necessarily would have attempted to use the check-in kiosk, been unable to do so, and been harmed as a result. Again, this assumption is contradicted by the evidence that individuals had different check-in experiences and some never even attempted to interact with the kiosk.

6. The methodology outlined in the Chasworth Report is insufficient, inaccurate, and unreliable for the purposes of identifying the size of the nationwide class or the California subclass.

## III. MR. CHASWORTH'S WIDE RANGE OF ESTIMATES OF THE SIZE OF THE CALIFORNIA SUBCLASS REVEALS THE UNRELIABILITY OF HIS METHODOLOGY

7. In his report, Mr. Chasworth provides 13 total estimates: five estimates for the nationwide class and another eight estimates for the California subclass. For purposes of this section of the report, I focus on Mr. Chasworth's estimates of the size of the California subclass. **Exhibit 1** summarizes these estimates and their corresponding methodologies. Mr. Chasworth's estimates vary based on three factors: (1) the data source; (2) the geographic

CONFIDENTIAL

level of aggregation of the data; and (3) whether he applies a market share estimate for Labcorp.

8. For reasons he does not explain, Mr. Chasworth selects two of his eight estimates to present in his "Conclusions" section, as representing the range of estimates he concludes represent the "California sub-class of legally blind people who may be denied independent access to LabCorp facilities."[4]

9. This purported range does not, in fact, include the highest and lowest estimates for the subclass that he includes in his report. The estimates for the subclass in Mr. Chasworth's report range from 1,575 people to 112,140 people,[5] yet he presents his conclusion as a range from 8,861 people to 112,140 people.[6] That is, the lower bound Mr. Chasworth presents as his conclusion includes more than five times as many people as the actual lowest estimate he reports.[7] Mr. Chasworth does not explain the reasoning behind this decision.

10. The difference between the highest and lowest estimates of the eight estimates presented in the Chasworth Report is 110,565 people—nearly the entire size of his upper bound. Notably, of the eight California subclass estimates Mr. Chasworth presents in his report, two stand out as substantially higher than the other estimates. The mean of all eight of the subclass estimates in the Chasworth Report is 35,326, while the median is only 13,905. This difference is driven by two estimates of over 100,000, which stand out from the other estimates, all of which are below 30,000.

11. In fact, Mr. Chasworth presents estimates that are contradictory: at one point in his report, he estimates that there are 101,273 legally blind people in California (whether harmed or not),[8] yet later estimates that there are more than that number of legally blind individuals in California who were harmed (112,140).[9] Mr. Chasworth provides no discussion or

4 Chasworth Report, p. 7.
5 Chasworth Report, pp. 5-6.
6 Chasworth Report, p. 7.
7 As discussed in **Appendix A**, there appears to have been a calculation error in Mr. Chasworth's estimate of 1,575. However, even correcting for that, his lower bound should be 2,490, and thus his purported lower bound of 8,861 includes 3.5 times as many people as his actual lower bound (as corrected).
8 Chasworth Report, p. 5.
9 Chasworth Report, p. 7.

explanation for the wide range in his estimates, nor for which estimates he considers to be more or less accurate.[10]

12. This broad range of estimates, with the two high estimates being substantially higher than the six other estimates, demonstrates the fundamental lack of reliability in Mr. Chasworth's methodology. It is well accepted among social scientists that if multiple data sources or approaches find similar results, the similarity (or "convergence") of those results provides stronger evidence of the accuracy of the estimate.[11] In the case of the Chasworth Report, however, the different methodologies and data sources provide wildly divergent estimates. These different estimates, by definition, cannot all be accurate. Yet Mr. Chasworth makes no attempt to reconcile the lack of convergent validity in his methodology or assist the finder of fact in identifying how many people fall within the proposed class definition.

13. The estimates in the Chasworth Report are untethered to actual individual persons who may or may not have been harmed and instead reflect broad generalizations based on a single nationwide estimate from the National Institutes of Health of one million blind individuals, various geographic scalar factors, and a flawed estimate of Labcorp's market share. This contributes to a lack of validity in Mr. Chasworth's wide range of very specific class size estimates. Mr. Chasworth's methodology is not reliable for identifying the number of individuals in the California subclass, let alone identifying or contacting the actual people he claims were harmed by Labcorp's introduction of kiosks at some (but not all) PSCs.

## IV. MR. CHASWORTH ASSUMES THAT ALL LEGALLY BLIND INDIVIDUALS WERE HARMED

14. The Chasworth Report provides estimates of the proposed California subclass on a per-year basis.[12] Mr. Chasworth's estimates of the proposed subclass assume that all legally blind individuals in California who may have visited a Labcorp PSC were harmed, for

---

[10] *See*, *e.g.*, Deposition of Sean Chasworth, April 16, 2021 ("Chasworth Deposition"), at 124:5-125:3 ("A. They are all accurate estimates based on the calculations that I performed… They are all estimates based on different methodologies and they are all accurate… Q. Do you have a preferred methodology for determining the number of blind people in the state of California? ... A. No, I don't. That's why I provided several.").

[11] According to the Reference Manual on Scientific Evidence, "convergent results support the validity of generalizations." (David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence,* The National Academies Press, 2011, pp. 211-302, at p. 223.)

[12] Chasworth Report, p. 7.

every year in the proposed class period. In half of his estimates, as seen in **Exhibit 1**, he does not even attempt to account for whether or not a legally blind individual even visited a Labcorp PSC in a given year, he simply estimates the number of legally blind individuals in California and assumes—without evidence—that *all* of those individuals: (1) visited a Labcorp PSC; (2) chose a Labcorp PSC that happened to have a kiosk installed and functional; and (3) tried and failed to use the kiosk. In the other half of his estimates, he applies an overstated market share for Labcorp to attempt to scale the estimate of legally blind individuals to those who may have visited a Labcorp PSC, but still fails to contend with: (1) whether the legally blind individuals visited a Labcorp PSC that had a functioning kiosk; and (2) whether the legally blind individuals attempted to or wanted to attempt to use a kiosk and were unable to do so.

### A. Half of Mr. Chasworth's Estimates Assume Every Legally Blind Individual in a Given Area Visited a Labcorp PSC Every Year

15. Four of Mr. Chasworth's eight California estimates (*Estimates 1, 3, 5,* and *7*, as described in **Appendix A** and listed on **Exhibit 1**) make no attempt whatsoever to estimate what fraction of the legally blind population actually visited a Labcorp PSC. This includes the estimate he includes as his upper bound in his conclusions (*Estimate 3*). That is, these estimates assume that *every single* legally blind individual who happens to live in the same zip code, city, county, or even state as at least one Labcorp PSC must have visited a Labcorp PSC every single year. Mr. Chasworth's upper bound assumes that every single legally blind individual in the 35 California counties that have Labcorp PSCs visited a PSC each year and was harmed.[13] This assumption is flawed on its face.

16. As discussed in the Deal Report, Labcorp PSCs are far from the only places to receive diagnostic testing.[14] These four California subclass estimates attempt to account for the proximity of the Labcorp PSC (with varying precision) but do not take into account any of the other factors that may influence patient choice, including other testing options, convenience of that location, insurance coverage, and idiosyncratic individualized patient preferences. In fact, as Mr. Chasworth indicates in his report, "LabCorp receives

---

13 Chasworth Report, pp. 6, 7.
14 Deal Report, ¶ 20-23.

approximately $7 billion in annual revenue in an $80 billion industry,"[15] indicating that the vast majority of laboratory testing is *not* performed by Labcorp. Thus, to assume that *all* legally blind individuals received testing at a Labcorp PSC every single year, as Mr. Chasworth does for four of his estimates, including the upper bound to his range, one must assume that blind individuals visited Labcorp PSCs for diagnostic testing at a wildly disproportionate rate to sighted individuals (in fact, essentially assuming that such individuals sought out Labcorp and focused their testing at PSCs and nowhere else). Mr. Chasworth has provided no evidence of such extreme patient sorting.

### B. Even for the Half of Mr. Chasworth's Estimates for which He Partially Accounts for How Many Individuals May Have Actually Visited a Labcorp PSC, He Applies a Faulty Market Share that Does Not Account for Labcorp's Business Model

17. The other four of Mr. Chasworth's eight California estimates (*Estimates 2, 4, 6,* and *8*, as described in **Appendix A** and listed on **Exhibit 1**) partially account for the existence of other options for diagnostic testing by including an estimate of Labcorp's market share. Mr. Chasworth's market share calculation, however, is still flawed. The 8.75% market share includes substantial revenue earned by Labcorp outside of the PSC setting, where the kiosk check-in option at the crux of this matter is inapplicable.

18. Mr. Chasworth estimates Labcorp's market share based on a Labcorp presentation to investors from February 2018.[16] In this presentation, Labcorp reports that its diagnostics segment (Labcorp Diagnostics or "LCD") reported approximately $7 billion in revenue in 2017, part of an estimated total $80 billion U.S. clinical laboratory testing industry.[17] Thus, Mr. Chasworth calculates that Labcorp's market share is $7 billion/$80 billion, or 8.75%.[18]

19. However, Mr. Chasworth fails to account for Labcorp's broad range of diagnostic services making up its $7 billion LCD revenue. As discussed in the Deal Report, sample collection can also be performed at hospitals, at many doctors' offices, and even at select

[15] Chasworth Report, p. 3.
[16] Chasworth Report, p. 3; Plaintiffs' Further Supplemental Disclosures Pursuant to Federal Rule of Civil Procedure 26(e); and Initial Expert Witness Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2), March 25, 2021, Exhibit E ("Investor Presentation").
[17] Investor Presentation, slide 29.
[18] Chasworth Report, p. 3.

pharmacies.[19] The same investor presentation upon which Mr. Chasworth relies notes that Labcorp has more than 5,000 in-office phlebotomists, as compared to approximately 1,900 PSC locations.[20] In addition, Labcorp provides diagnostic testing even for samples that were not collected by Labcorp.[21] Mr. Chasworth's estimate of Labcorp's market share does not account for these other sources of revenue for Labcorp Diagnostics.

20. In fact, as discussed in the Deal Report, Mr. Sinning testified that testing services performed at PSCs represent only about 20% of Labcorp's business.[22] That is, of Labcorp's $7 billion in diagnostic services revenue (the basis for Mr. Chasworth's 8.75% market share), only 20% comes from PSCs, and accordingly only 20% would be relevant to the kiosk check-in experience at the crux of this litigation. Thus, Mr. Chasworth has overstated Labcorp's market share by 80%. A more appropriate market share estimate would be 20% of 8.75%, or 1.75%.

21. In addition, as with his estimates that do not include a market share adjustment, the market-share-adjusted estimates assume that *every single* blind individual receives some form of diagnostic testing each year (whether through Labcorp or not). Mr. Chasworth has not adjusted for the proportion of the blind population that might receive testing each year (whether at a Labcorp PSC or not).

### C. Mr. Chasworth Does Not Account for Variation in Kiosk Availability

22. All of Mr. Chasworth's estimates stop at the point of estimating the number of legally blind people that he assumes may have visited a Labcorp PSC. He makes no further attempt to identify whether any individual visited a Labcorp PSC with a working kiosk. Mr. Chasworth's analysis simply *assumes* that all blind individuals who visited a Labcorp PSC were harmed.[23] In fact, as discussed in the Deal Report, not all Labcorp PSCs even have kiosks, nor did they all receive them at the same time. Labcorp began introducing check-

---

[19] Deposition of Joseph Sinning, February 2, 2021 ("Sinning Deposition") at 36:20-37:9, 77:18-78:8. *See also* Deal Report, ¶ 21.

[20] Investor Presentation, slide 7.

[21] Sinning Deposition, at 37:4-9.

[22] Sinning Deposition, at 37:10-19. *See also* Deal Report, ¶ 21. I note that Mr. Chasworth had access to Mr. Sinning's deposition and cited it for other aspects of his calculation.

[23] *See*, *e.g.*, Chasworth Deposition, Rough Transcript at 201:14-18 ("Q. Do you know whether it is a true statement, sir, that all legally blind individuals in Lab Corp's market were denied independent access to Lab Corp's services as a result of Lab Corp's use of express kiosks? A. That's an assumption that I'm using.").

in kiosks at its PSCs in October 2017.[24] However, kiosks were rolled out over the course of at least a year. As seen in **Exhibit 3**, PSC kiosks in California were first installed in November 2017 and installed through September 2018. Mr. Chasworth's estimates assume—without evidence—that the proposed California subclass would be the same size in all relevant years, yet **Exhibit 3** clearly demonstrates that kiosk availability in California—a key component in any class determination—varied over time.

23. Moreover, as of August 2020, 48 Labcorp PSCs still did not have kiosks installed, 19 of which are in California.[25] Of the 19 PSCs without kiosks, 15 of them are included in Mr. Chasworth's analysis.[26] In addition, as discussed in the Deal Report,[27] even among facilities with installed kiosks, there were several instances of kiosk outages, which Mr. Chasworth does not consider in his analysis.[28]

24. Mr. Chasworth does not propose excluding and does not explain how he plans to identify potential class members who visited a PSC at a time when a kiosk was not installed or not functioning. Despite his assignment being "to estimate the number of legally blind individuals who were denied independent access to LabCorp's services as a result of LabCorp's use of 'Express Kiosks,'"[29] Mr. Chasworth was unclear in his deposition about whether he needs to take account of whether the people in his estimates actually visited the working kiosks. For example, when asked whether it would be reasonable to assume that a percentage of the Labcorp market may never have interacted with a Labcorp check-in kiosk, he at first agreed, but then specified while it was possible it did not impact his estimates because he did not know if that was "a proper definition of a class member or not."[30]

25. Furthermore, of the 15 California PSCs without kiosks that Mr. Chasworth includes in his analysis, seven are the only PSCs within their zip code,[31] five are the only PSCs within

---

24 Sinning Deposition, at 83:7-11. *See also* Deal Report, ¶ 25.
25 Davis-LabCorp00004354.
26 Davis-LabCorp00000515. The other four California PSCs without kiosks do not appear on the outdated list of PSCs upon which Mr. Chasworth relies.
27 Deal Report, ¶ 26.
28 Chasworth Deposition, Rough Transcript at 111:7-15.
29 Chasworth Report, p. 2.
30 Chasworth Deposition, Rough Transcript at 98:7-102:15.
31 The zip codes that should have been excluded are: 96073, 92126, 92223, 93240, 94132, 94574, and 95531.

their cities,[32] and one is the only PSC in Del Norte county. Per Mr. Chasworth's methodology, individuals within these zip codes, cities, and counties are only likely to go to Labcorp PSCs within their own geographic region. If they had done so (as Mr. Chasworth assumes), they would have visited a Labcorp PSC without a kiosk, and thus there is no potential for these legally blind individuals to have experienced harm as a result of an inaccessible kiosk.

### D. Mr. Chasworth Does Not Account for Variation in Patients' Individualized Check-In Experiences

26. Mr. Chasworth's estimates assume that all legally blind individuals who visited a Labcorp PSC were necessarily harmed as a result of that visit. However, he provides the finder of fact with no basis upon which he makes that assumption, stating that whether someone is or is not a class member is a legal conclusion.[33] In other words, he opines on a maximum number of people who might be in the class (depending on his methodology), based on the number of people he believes are legally blind and in Labcorp's market and thus *might* have gone to a Labcorp PSC, but provides no opinion on the number of people who actually are class members because they were, in Mr. Chasworth's words, "denied independent access to Labcorp facilities."[34]

27. In addition to failing to account for kiosk availability, Mr. Chasworth's estimates do not account for the variety of potential check-in experiences that these individuals may have faced, some of which may not have led to any harm. As discussed in the Deal Report, proposed class members likely had a variety of experiences that would require individualized inquiry to determine whether they were actually denied such access and consequently harmed during their Labcorp experience.[35] Visually impaired individuals may choose to use the front desk or mobile check-in option or receive assistance from front desk staff or their family members, even if the check-in kiosks are available. For example, Mr. Vargas, who visited a Labcorp PSC in California, testified that he was told he need not

---

32 The cities that should have been excluded are: Palo Cedro, Cherry Valley, Lake Isabella, Saint Helena, and Crescent City.
33 Chasworth Deposition, Rough Transcript at 99:17-20.
34 Chasworth Report, p. 7.
35 Deal Report, ¶¶ 31-37.

use the kiosk and that someone would check him in.[36] Similarly, Mr. Harden testified that he was never directed to a kiosk to check in and always went directly to the desk.[37]

28. Different Labcorp locations have different methods of staffing, with dedicated check-in staff, full-time, and part-time staff available to assist with patient check-in, likely contributing to different patient check-in experiences. As discussed in the Deal Report,[38] certain locations, but not all, have a dedicated Patient Intake Representative ("PIR") who sits at the front desk to check in patients, while others have only phlebotomists available.[39] Among Labcorp PSCs with only phlebotomists, some have only a single phlebotomist while others have multiple working at the same time.[40] This variation in staffing may impact whether staff are available to immediately greet and assist patients with check-in. For example, where a PSC has two phlebotomists, but no PIR, one phlebotomist will often sit at the front desk full-time, while allowing the other to focus on collecting samples for testing. Depending on the circumstance, however, in locations with multiple phlebotomists, each may handle both collections and check-ins.[41] Mr. Chasworth has made no adjustment to reflect that not all blind individuals that visited a Labcorp location with a working kiosk may have attempted to use that kiosk and that, instead, some may simply have visited the check-in desk and bypassed the kiosk entirely.[42]

29. Finally, Mr. Chasworth does not account for the fact that not all legally blind individuals are unable to use kiosks. As Mr. Chasworth notes, the U.S. National Institutes of Health statistic he repeatedly relies upon defines legally blind individuals as those with vision of 20/200 or worse.[43] However, as mentioned in the Deal Report, research shows that "people with acuities as low as 20/2000 (acuity letters 100 times larger than 20/20 letters) can read… provided that adequate magnification is available."[44] That is, at least some people with vision 10 times worse than 20/200 may be able to read, with appropriate

36 Deposition of Julian Vargas, February 10, 2021, at 22:9-19, 23:2-4, 56:16-20.
37 Deposition of John Harden, February 17, 2021 at 25:19-26:19.
38 Deal Report, ¶ 35.
39 Sinning Deposition, at 47:22-48:4.
40 Sinning Deposition, at 79:12-21.
41 Interview with Joseph Sinning, March 8, 2021.
42 Chasworth Deposition, Rough Transcript, at 130:4-25.
43 Chasworth Report, p. 3.
44 Legge, Gordon E., "Reading Digital with Low Vision," *Visible Language*, vol. 50, 2 (2016), pp. 102-125. *See also* Deal Report, ¶ 39.

magnification, and thus use the kiosks. In fact, statistics show that 51% of visually impaired people with smartphones use their phone camera and screen as a magnifier.[45]

## V. CONCLUSION

30. Mr. Chasworth's analyses are not sufficient to establish that he has a reliable opinion on the proposed class size or an accurate method to identify these potential class members. The Chasworth Report provides a wide range of estimates that are untethered to actual individual class members, and Mr. Chasworth has provided no opinion on the correct number of individuals in the nationwide class or the California subclass.

31. Mr. Chasworth's analyses include numerous unreasonable assumptions, including:

- That *all* legally blind individuals in California visit a Labcorp PSC every year, despite evidence that Labcorp does not provide 100% of diagnostic testing;
- That *all* of Labcorp's revenue (and thus market share) is attributable to testing at PSCs, despite evidence that Labcorp PSCs account for only 20% of Labcorp diagnostic revenue;
- That *all* individuals visiting a Labcorp PSC would have visited a PSC with a functioning kiosk, despite evidence that some PSC locations had or have no kiosks and that kiosks are not always operational;
- That *all* legally blind individuals visiting a Labcorp PSC would have attempted to check in at the kiosk and been harmed as a result, despite evidence that individuals had different check-in experiences.

32. Mr. Chasworth's wide range of estimates that all rely on unreasonable assumptions do not provide a reliable basis for identifying the size of the nationwide class or the California subclass.



Bruce Deal

April 21, 2021

---

45 Michael Crossland, Rui Silva and Antonio Macedo, "Smartphone, Tablet Computer and E-reader Use by People with Vision Impairment," July 28, 2014, available at https://pubmed.ncbi.nlm.nih.gov/25070703/. *See also* Deal Report, ¶ 39.

## CERTIFICATE OF SERVICE

I certify that on June 6, 2022, I electronically filed the foregoing petition and exhibits with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that on the same day, I caused the petition to be served by email and by commercial carrier for next-day delivery upon the following:

Jonathan D. Miller, Esq.
Alison M. Bernal, Esq.
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Tel: (805) 963-2345
Fax: (805) 284-9590
jonathan@nshmlaw.com
alison@nshmlaw.com

Matthew K. Handley, Esq.
HANDLEY FARAH & ANDERSON PLLC
200 Massachusetts Avenue, NW
Seventh Floor
Washington, DC 20001
Tel: (202) 559-2411
Fax: (844) 300-1952
mhandley@hfajustice.com

Benjamin J. Sweet, Esq.
NYE, STIRLING, HALE & MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Tel: (412) 857-5350
ben@nshmlaw.com

Attorneys for Plaintiffs-Respondents, LUKE DAVIS, JULIAN VARGAS, AMERICAN COUNCIL OF THE BLIND, and the Proposed Class

**CHAMBERS COPIES:**
Honorable Fernando M. Olguin
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
United States Courthouse
350 West 1st Street
6th Floor, Courtroom 6D
Los Angeles, California 90012

/s/ Kirstin E. Largent